EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* NAR-
CISO GALARZA RODRÍGUEZ, acusado y apelante.

Núm. 14421.—*Sometido:* Junio 1, 1950.   *Resuelto:* Junio 14, 1950.

*Fernando Pérez Regis,* abogado del apelante; *Hon. Procurador
General Vicente Géigel Polanco* y *Frank Vizcarrondo Vivas,*
*Fiscal Auxiliar del Tribunal Supremo,* abogados de El Pueblo,
apelado.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tri-
bunal.

De la sentencia condenándole a reclusión perpetua con
trabajos forzados apeló Narciso Galarza Rodríguez para ante
este Tribunal e imputa a la Corte de Distrito de Ponce haber
cometido dieciocho errores durante el curso del juicio.   Por
varios de los motivos alegados el fiscal se allana a la revoca-
ción solicitada.

La prueba presentada por el Pueblo tendió a demostrar
que estando Pascual Castro Montalvo recluído en uno de los
pabellones del hospital municipal de Yauco, en estado coma-
toso, el acusado penetró en el mismo y de manera deliberada
y premeditada infirió a aquél siete puñaladas, como resul-
tado de las cuales Castro Montalvo falleció.   La de la defen-
sa fué al efecto de que el acusado, que era chófer de carro
público, tenía dos hermanas menores de edad, huérfanas, que

dependían totalmente de él y a quienes idolatraba; que una de ellas, aunque casada, vivía separada de su esposo, y que la otra era soltera y de baja mentalidad, residiendo ambas con él en una pequeña casa de madera en el barrio Las Palomas, sitio Susúa Abajo, de Yauco; que el día 5 de septiembre de 1947 mientras varios obreros reparaban el balcón de la referida casa del acusado, el occiso, que era hombre de pésima reputación, penetró sigilosamente por la puerta trasera de la casa como a las 3:30 de la tarde, y al hallarse con las dos hermanas lanzó a Ana, la soltera, sobre una cama y trató de ultrajarla, sacando a la vez un puñal y amenazándolas; que su hermana Cruz, la casada, forcejeó con Castro Montalvo y éste la hirió en el dedo índice de la mano derecha, fracturándoselo; que Cruz gritó y Leonardo Ramírez, uno de los hombres que como ayudante de carpintero trabajaba en ese momento en el balcón de la casa, al oír los gritos corrió hacia el interior de la casa y al ver a Cruz herida y darse cuenta de la situación, le asestó a Castro Montalvo un golpe en la cabeza con un hierro o uña de sacar clavos (así la calificó el agresor) que traía; que las muchachas salieron huyendo y Castro Montalvo las siguió por breves instantes; que Leonardo Ramírez se fué en seguida para el pueblo a dar cuenta de lo ocurrido a la policía; que poco después Castro Montalvo, quien fué hallado inconsciente, en cuclillas y con la cabeza entre las piernas, fué llevado al hospital municipal, hallándose junto a él un cuchillo bastante largo y ocupándosele más tarde en el hospital otro cuchillo; que como cuarenta minutos o una hora más tarde el acusado, quien traía una compra para sus hermanas, llegó a su casa y se sorprendió al ver tanta gente en los alrededores; que al penetrar en la casa vió un charco de sangre en la sala y al preguntar qué ocurría e informársele que Castro Montalvo había tratado de violar a sus hermanas, él se echó a llorar; que preguntó por éstas y al indicársele que una de ellas estaba herida y había ido al hospital a curarse, salió para allá inmediatamente con el propósito de ver cómo seguía ella; que llevaba consigo un

cuchillo que encontró un día en su automóvil y que utilizaba en reparar los neumáticos de éste; que al llegar al hospital en busca de su hermana vió a Castro Montalvo acostado en una de las camas y vino a su mente la pasión súbita de matarle asestándole varias puñaladas.

Con esta prueba el jurado que conoció del caso rindió un veredicto condenatorio de asesinato en primer grado y la corte, como ya hemos dicho, sentenció al acusado a sufrir la pena de reclusión perpetua.

■■ La teoría del ministerio público fué que se trataba de un asesinato premeditado y deliberado y la de la defensa que cuando el acusado asestó las puñaladas a Castro Montalvo ya éste había fallecido a consecuencias del golpe inferídole en el cráneo por Leonardo Ramírez, como resultado del cual el occiso sufrió una intensa hemorragia intracraneal y la fractura del cráneo, siendo prueba de que él estaba muerto el hecho de que al tratar de aplicársele suero a Castro Montalvo mientras se hallaba en estado comatoso, el mismo no bajaba. También sostuvo la defensa que las heridas inferidas por el acusado al occiso se debieron a una súbita pasión o a un arrebato de cólera al hallarse éste momentaneamente con el hombre que poco antes había tratado de ultrajar a sus hermanas.

Durante el curso del juicio la defensa trató insistente y repetidamente de ofrecer prueba tendiente a demostrar no sólo que los padres del acusado habían muerto locos y la mala reputación del interfecto sino también que una persona de la poca preparación del acusado ante una situación como la que tuvo que afrontar, al hallarse con el agresor de las menores, sufrió una reacción violenta y bajo ese arrebato atacó con el cuchillo al interfecto.

Los errores señalados se dirigen en su inmensa mayoría a la actuación de la corte durante el curso del juicio, a saber: hacer a los testigos preguntas perjudiciales al acusado; hacer en presencia del jurado comentarios desfavorables a éste; hacer comentarios perjudiciales al acusado en relación con la

teoría de la defensa; no permitirle presentar prueba sobre su tara de locura; no permitir al Dr. Alonso Caíñas testificar sobre la reacción que un sujeto como el acusado puede experimentar al llegar a su casa y ver un charco de sangre en el suelo, al igual que en relación con la reacción que tuvo que experimentar el acusado al encontrarse momentaneamente con el agresor de sus hermanas; y al negarse a dar instrucciones sobre homicidio voluntario.

No es menester que discutamos los errores separadamente. Basta a nuestro juicio que hagamos constar que la teoría del acusado siempre fué que de hallarse vivo Castro Montalvo al momento en que él le infirió las heridas, su actuación se debió a un arrebato de cólera, mas no a premeditación o deliberación. La corte, repetimos, no permitió que el acusado presentara prueba de clase alguna sobre las reacciones que pudo sufrir el acusado, no obstante tener ella pleno conocimiento de esa teoría y a pesar de haberlo hecho constar así reiteradamente. Examinemos, sin embargo, el testimonio del Dr. Alonso Caíñas según figura en autos. Éste manifestó:

"Los organismos reaccionan de distinta manera ante un cuadro de dolor, de inquietud, de miedo, de terror y entra siempre en esas reacciones normales, de un individuo normal, . . . la preparación, el intelecto, el medio de vida, el medio de herencia, el medio educativo, . . . . Es decir, que el carácter tiene una serie de disciplinas esporádicas, simples y espontáneas, que dan un matiz inicial desde el niño, el adolescente, el adulto, el viejo, hombres y mujeres, *y entonces puede producir, en un futuro como el que se ha relatado aquí . . . . reacciones de soberbia, de rabia, de dolor, de venganza, de alteración completa de los nervios, de la mente y puede un individuo romper el equilibrio y realizar los actos anormales cuando se rompe ese equilibrio de una persona normal.*

"· · · · · · · ·

"*Yo he oído aquí, de un individuo de temperamento impulsivo, dentro de un estado emocional de sorpresa, de dolor, de un ser querido herido, supuestamente herido, que no lo encuentra y forma en su mente una serie de reacciones, de duda y de confusiones, que lo estimulan dentro de ese estado de perturbación*

*del equilibrio, de un individuo normal, que ese equilibrio se rompe
y produce un shock emocional, el típico, capaz de producir los
hechos de que se le acusa."* (Bastardillas nuestras.)

La corte, no obstante saber que el acusado trataba de demostrar que había actuado en un arrebato de cólera, se ciñó a su criterio de que éste lo que trataba de demostrar era que estaba loco al momento de cometer el acto por el cual se le acusaba y se negó a permitir que continuara el interrogatorio sobre los extremos arriba reseñados.

El fiscal de este Tribunal al allanarse a la revocación manifiesta que:

"Entendemos que la prueba presentada por la defensa, y la cual no fué contradicha en forma alguna por la prueba de cargo, hacía indispensable el haber transmitido al jurado instrucciones sobre homicidio voluntario."

Es innegable que—no obstante la actuación de la corte al no permitir que el acusado interrogara con mayor amplitud al Dr. Alonso Caíñas—de acuerdo con lo manifestado por el perito médico de la defensa pudo surgir la duda de si el acusado al asestar las puñaladas a Castro Montalvo, lo hizo o no bajo un arrebato de cólera. No era ésa cuestión a ser resuelta por la corte y ante tal situación, no debió ella dejar de transmitir instrucciones sobre homicidio voluntario. Semejante instrucción fué expresamente solicitada por el acusado y al ser denegada, éste anotó la debida excepción. La comisión de tal error, debe dar lugar a la revocación de la sentencia. *Pueblo* v. *Calderón*, 50 D. P.R. 336; *Pueblo* v. *Villanueva*, 49 D.P.R. 63; *Pueblo* v. *Fernández*, 49 D.P.R. 586. Véase, además, 41 C.J.S., págs. 155, 214, secs. 371, 395.

Conforme resolvió el Tribunal Supremo federal en *Stevenson* v. *United States*, 162 U.S. 313, 314, 40 L. ed. 980:

"No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilitar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición

de homicidio voluntario, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fué homicidio voluntario y no asesinato.

"...

"Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el jurado, y no una de derecho a ser resuelta por el tribunal."

Véase también el caso de *Kinard* v. *United States*, 96 F.2d 522 (1938) en el cual la Corte de Apelaciones de los Estados Unidos para el Distrito de Columbia se expresó así:

"Es cierto que la declaración del acusado fué abiertamente controvertida. Podría sostenerse que la prueba tendía a demostrar de manera abrumadora que se había cometido un asesinato más bien que un homicidio voluntario. . . . No era el deber de la corte sentenciadora apreciar la prueba y determinar si el acusado era culpable de asesinato o de homicidio, sino meramente determinar la cuestión preliminar de derecho, o sea si hubo tal carencia de prueba sobre homicidio que exigía que la cuestión no fuera sometida a la consideración del jurado, . . .

"El hecho de que en el presente caso hubiera otra prueba altamente presuasiva de que se trataba de un asesinato, no afecta la aplicación de la regla enunciada."

En apoyo de lo anterior se citan el caso de *Stevenson* v. *United States*, supra, y otros.

Bajo las circunstancias del presente caso nos parece que la corte inferior estuvo en el deber de dar instrucciones sobre el delito de homicidio voluntario y que cometió grave error perjudicial al acusado al no hacerlo así. No es menester, por tanto, discutir los demás errores señalados.

*Debe revocarse la sentencia apelada y devolverse el caso a la corte inferior para la celebración de un nuevo juicio.*