EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RÓMULO SERBIÁ BONILLA, acusado y apelante.

Número 15386.

*Sometido:* 22 de junio de 1953. *Resuelto:* 25 de septiembre de 1953.

*Rafael V. Pérez Marchand* y *Santos P. Amadeo,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Rafael L. Ydrach Yordán, Fiscal Auxiliar, Tribunal Supremo,* abogados de El Pueblo, apelante.

(³) El caso de *Roselló* fué resuelto después que el tribunal a quo había dictado sentencia en el de autos.

El Juez Presidente Señor Snyder emitió la opinión del tribunal.

El apelante fué acusado de asesinato en primer grado. Fué juzgado ante un jurado y hallado culpable de asesinato en segundo grado. Posteriormente, radicó una moción de nuevo juicio predicada en la negativa del tribunal sentenciador a darle instrucciones al jurado en cuanto a homicidio involuntario. La corte declaró sin lugar esta moción y sentenció al acusado a sufrir la pena de diez a doce años de presidio.

Se acusó también al apelante por el delito de portar armas. Este caso se vió conjuntamente con el de asesinato. La corte sentenciadora declaró culpable al acusado del delito de portar un arma prohibida y le impuso seis meses de cárcel.

Contra estas dos sentencias el acusado entabló recurso de apelación. Varios meses después, el acusado radicó una segunda moción de nuevo juicio en ambos casos por el fundamento de que uno de los dos taquígrafos que tomaron parte del récord taquigráfico del juicio había fallecido. Esta moción fué también declarada sin lugar y el tribunal sentenciador ordenó al acusado que presentara una exposición del caso de conformidad con el artículo 356 del Código de Enjuiciamiento Criminal, ed. de 1935, basada en las minuciosas notas que el juez sentenciador tomó durante el juicio. El acusado preparó dicha exposición del caso "bajo protesta". La misma fué aprobada por el tribunal sentenciador y forma parte de los autos en apelación.

El primer señalamiento de error es que "La corte sentenciadora cometió error al rehusar dar al jurado una instrucción sobre homicidio involuntario a pesar de que había desfilado en el proceso prueba suficiente para justificar dicha instrucción."

La instrucción solicitada por el acusado y denegada por la corte dice así: "Que habiendo pasado prueba de que el

acusado hizo saber a sus amigos, al salir de su casa (*res gestae*) que había sufrido un accidente—declaración de Víctor M. Casals, testigo del Pueblo—y que pedía ayuda porque por accidente había herido a su mujer y quería una ambulancia—testimonio de Aida Isabel Benliza—procede un veredicto de homicidio involuntario." (¹)

El testimonio del Pueblo demostró que el acusado y la víctima vivían juntos; que el día 31 de diciembre de 1950 y al filo de la medianoche se oyeron disparos de revólver a la vez que el acusado saliendo a la calle desde su casa, manifestaba a varios amigos: "Acabo de matar la mujer", "Yo juré que la iba a matar a las doce y a las doce la maté"; que el acusado entonces, como sus amigos no le creyeron, "sacó un revólver del bolsillo derecho" y lo enseñó. Al mismo tiempo, encaminó sus pasos a la casa de su amigo Víctor Miguel Casals López, quien ya por teléfono había notificado a la policía; que el acusado, una vez en casa de Casals, le dijo a éste, sin entrar en detalle, "que había ocurrido un accidente en su casa y que su esposa estaba herida".

Se practicó la autopsia a la víctima demostrando la misma dos heridas de bala, una de las cuales penetró por el quinto espacio intercostal izquierdo atravesando el corazón, siendo esta herida la causa de la muerte. La otra bala pasó por el ilium y quedó debajo de la piel de la cadera izquierda. El testimonio del Pueblo demostró asimismo que al acusado se le ocupó un revólver que guardaba en un ropero, teniendo aquél tres balas disparadas y dos "mascadas".

Fuera del testimonio al efecto de que el acusado era policía insular desde 1919 y nunca se le había formulado cargo

---

(¹) El artículo 203 del Código Penal, ed. de 1937, prescribe lo siguiente:

"*Homicidio, Definición.* Homicidio es dar muerte ilegal a un ser humano sin que medie malicia. Es de dos clases:

"1. *Voluntario.* Voluntario: cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera.

"2. *Involuntario.* Involuntario: cuando ocurre al realizarse un acto ilegal, que no constituyere delito grave (*felony*); o al realizarse un acto legal que pudiere ocasionar muerte en forme ilegal, o sin la debida prudencia o circunspección."

alguno, la única evidencia presentada por él fué el testimonio de Ángel Borrero y el de Aida Isabel Benliza de Nieves. El primero declaró que la noche de los hechos el acusado estaba pacífico y que momentos antes le había vendido botellas de ron y soda.

Aida Isabel Benliza de Nieves declaró, de acuerdo con la exposición del caso, lo siguiente:

"Yo salí el 31 de diciembre a dar una vuelta y ellos me saludaron y me invitaron a entrar, y subí a la casa y le pedí permiso y como de nueve a once estuve en casa del acusado. Ambiente fué agradable. Se recitaron poesías, él bailó con mi nena (15 años). No noté nada en el ambiente. A las 12 de la noche yo estaba en mi casa. Había estado en un bailecito. A las doce menos cuarto estaban mis familiares. Sonaron las doce, nos saludamos. Yo salí al balcón y la señora de Serbiá tiró agua a la calle, que cogió al carro de mi hermano. Me entré para adentro. Ella estaba muy contenta y alegre. Mi esposo es periodista y trabaja en 'El Mundo'. Después que entré del balcón y volví a salir y ví a todos los vecinos reunidos y Serbiá estaba parado y decía: 'Dios mío, ayúdenme, creo que he matado a mi mujer.' Bajamos y mi marido le preguntó al acusado y éste dijo: 'Un accidente, creo que he matado a mi mujer, llamen la ambulancia.' Conozco a Enrique Quiñones. No lo ví por allí en ese momento. No ví que el acusado felicitara a Enrique y le echara el brazo. Antes de yo bajar que ya se decía que había matado a su mujer, oí a Quique y le dije que entrara a ver, y encontró el portón cerrado, y yo le dije que brincara y brincó y se asomó y dijo que sí con la cabeza. No ví a Serbiá entrar a su casa nuevamente. No hizo ademán ni demostración de que estaba armado. No ví ese revólver. Vino la policía. A mi esposo le dijo: 'Tú eres periodista, a tí te diré más tarde.' "

En apoyo de su tesis de que el tribunal sentenciador debió instruir al jurado en cuanto a homicidio involuntario, el acusado descansa en la declaración de Víctor Miguel Casals López al efecto de que, inmediatamente después de la muerte de la esposa, el acusado le dijo "que había ocurrido un acci-

dente en su casa y que su esposa estaba herida". También descansa en el testimonio de Aida Isabel Benliza de Nieves, antes copiado.

Indudablemente, en un caso de asesinato, el tribunal sentenciador debe darle al jurado instrucciones de homicidio *si de los autos surge alguna evidencia que justifique un veredicto de homicidio*. *Pueblo* v. *Galarza*, 71 D.P.R. 557; *Pueblo* v. *Alméstico*, 18 D.P.R. 320; *Pueblo* v. *Carrión*, 35 D.P.R. 901. Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte. Por otro lado, el tribunal sentenciador no debe trasmitir instrucciones de homicidio si los autos están huérfanos de toda evidencia que justifique tal veredicto. Anotaciones, 21 A.L.R. 603; 27 A.L.R. 1097; 102 A.L.R. 1019; 3 L.R.A. (N.S.) 1153, 1160. Permitir que subsista tal práctica equivaldría en efecto a permitir al jurado a imponer un castigo diferente a aquél prescrito para el delito que de hecho se cometió. *Sparf and Hansen* v. *United States*, 156 U.S. 51, 64 (1895).

El acusado sostiene que el testimonio de los dos testigos que ponen en boca suya la frase de que había ocurrido un "accidente", exigía al tribunal sentenciador trasmitir al jurado instrucciones sobre homicidio. No estamos de acuerdo. Empezaremos por indicar que la palabra "accidente" puede ser usada para designar dos diferentes situaciones de hecho, las que a su vez demandan diferentes conclusiones de derecho. Primeramente, puede ocurrir un "accidente" el cual bajo los hechos, de haberse presentado alguno por el acusado y ser creído por el jurado, exija la absolución. En segundo lugar, la palabra "accidente" puede también usarse como la caracterización genérica de hechos diferentes que, de constar en autos, establecerían un caso de homicidio. *State* v. *Bartley*, 84 S.W.2d 637 (Mo., 1935); *Glover* v. *Commonwealth*, 83 S.W.2d 881 (Ky., 1935).

Al exponer su teoría durante el juicio, el acusado aparentemente fué del criterio de que el testimonio demostraría

que lo que ocurrió fué la primera clase de "accidente", lo cual le daba derecho a salir absuelto. (²)   Esa cuestión no está ahora ante nos, toda vez que el acusado no insiste ya en la absolución.   Ahora insiste en que los hechos que en verdad constan en autos, distinguidos de los que él hizo constar en su teoría, exigían instrucciones sobre homicidio.

Rechazamos esta contención porque de los autos no surge hecho alguno para sostenerla.   Es cierto que, de acuerdo con lo declarado por Víctor Miguel Casals, el acusado dijo que "había ocurrido un accidente en su casa y que su esposa estaba herida"; y, según Isabel Benliza de Nieves, el acusado manifestó "Dios mío, ayúdenme, creo que he matado a mi mujer", y "Un accidente, creo que he matado a mi mujer, llamen una ambulancia".   Pero decir que ha ocurrido "un accidente" es exponer una conclusión.   Y dicha conclusión—si ha ocurrido o no un accidente—debe ser determinada por el jurado y no por los testigos o por el acusado.   Para justificar una conclusión del jurado al efecto de que la muerte fué ocasionada por un accidente de la clase que constituye homicidio, era imperativo que los autos contuvieran por lo menos alguna evidencia, no importa cuán escasa, indicativa de los hechos o circunstancias constitutivos del alegado accidente.   Aquí no hubo tal evidencia; lo único que existe en autos es la manifestación del acusado, a través de los testigos, calificando la muerte como "accidente".

El caso de *Pueblo* v. *Carrión*, supra, citado por el apelante, es distinguible.   En dicho caso hubo un conflicto en la evidencia.   Un testigo del Pueblo declaró que vió al acusado apuntar su revólver a la víctima; otros testigos oyeron al acusado exclamar: "¡Ay, Dios mío, qué he hecho yo!"

_____

(²) La teoría del acusado, según la Exposición del Caso, fué que "El acusado, ebrio, y su mujer, la supuesta víctima, ebria también, pasaron el día celebrando la llegada del año.   Al querer él disparar el revólver para despedir el año, ella se opuso, para hacerlo ella, y ahí, accidentalmente, ocurrió la muerte."

Pero, a nuestros fines, el testimonio crucial fué el de una testigo del acusado quien declaró que el acusado estaba trasteando un revólver cuando se disparó el tiro; que ella no vió al acusado apuntar con el revólver; y que si el acusado hubiera apuntado con el revólver, ella lo hubiera visto porque estaba fijándose.

La teoría del acusado en el caso de *Carrión* fué al efecto de que el apelante, un guardia de penales que acostumbraba portar un revólver, al trastearlo accidentalmente lo disparó. En dicho caso resolvimos que bajo las circunstancias la evidencia exigía instrucciones al jurado tanto sobre homicidio como sobre asesinato. Pero en el referido caso hubo evidencia sobre la cual el jurado podía basar un veredicto de homicidio; v.g., el testimonio de la joven que vió al acusado cuando ocurrió el suceso y quien juró que el acusado no apuntaba con el revólver. Aquí, como hemos visto, no hay hechos algunos en relación con un accidente. En ausencia de tal evidencia, el juez sentenciador no hubiera tenido justificación alguna al permitirle al jurado *especular* en cuanto a los hechos que constituyeron el accidente y los cuales, de estar en los autos y ser creídos por el jurado, concebiblemente hubieran justificado un veredicto de homicidio. Por consiguiente, el tribunal sentenciador no cometió error al negarse a instruir al jurado sobre homicidio involuntario. [3]

---

[3] Véase el artículo 247 del Código de Enjuiciamiento Criminal, ed. de 1935, que dispone: "En los juicios por asesinato, una vez probado que la muerte ha sido consumada por el acusado, será de la incumbencia de éste el probar que han mediado las circunstancias atenuantes o que excusen o justifiquen el hecho, a menos que la prueba aducida por la acusación tienda a demostrar que el crimen cometido sólo reviste carácter de homicidio o que el acusado tenía jurisdicción (sic) o excusa."

En *Newby* v. *State*, 188 Pac. 124 (Okl., 1920) la corte dijo a la pág. 128: "Como repetidamente hemos resuelto hasta el' presente, decidimos que la ley es que, si existe evidencia, por poca que sea, que tienda a reducir el grado del delito de asesinato a homicidio en cualquiera de sus modalidades, el tribunal sentenciador debe otorgar al acusado el beneficio de cualquier duda que surja de la evidencia, e instruirlo sobre tales grados inferiores. Sin embargo, el tribunal no viene obligado a vagar por el campo de las conjeturas o de la especulación, a fin de trasmitir instrucciones sobre alguna teoría del caso que razonablemente no esté sostenida por la evidencia."

El segundo señalamiento es que el tribunal sentenciador cometió error al declarar sin lugar la moción de nuevo juicio por el fundamento de que uno de los taquígrafos que tomó parte del testimonio había fallecido sin transcribir sus notas, haciéndole imposible al acusado perfeccionar su apelación. El acusado no apeló de la resolución declarando sin lugar su moción de nuevo juicio. En consecuencia no podemos considerar este error señalado. *Pueblo* v. *Millán,* 66 D.P.R. 243, 258, y casos citados. Sobre los méritos de esta cuestión, *cf. Carrión* v. *Sampedro et al.,* 74 D.P.R. 413.

*Las sentencias del anterior tribunal de distrito serán confirmadas.*

El Juez Asociado Sr. Marrero no intervino.