EL PUEBLO DE PUERTO RICO, apelado, *v.* JAVIER GONZÁLEZ COLÓN, EDWIN GONZÁLEZ COLÓN, ALBERTO GONZÁLEZ COLÓN, RAMÓN GONZÁLEZ MALAVÉ y WILLIAM GONZÁLEZ COLÓN, acusados y apelantes.

Número: CR-79-33      Resuelto: 3 de abril de 1981

*José A. de la Texera* y *Julio Eduardo Torres,* abogados de los apelantes; *Héctor A. Colón Cruz, Procurador General,* y *Miguel A. Santana Bagur, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

La omisión de dar instrucciones sobre el delito de homicidio voluntario, solicitadas oportunamente por la defensa, constituye en este caso un error tan perjudicial que viola la garantía fundamental de un juicio justo y que, en consecuencia, obliga a la revocación de las sentencias dictadas contra los apelantes por el delito de asesinato en primer grado y a la celebración de un nuevo juicio.

Nuestro ordenamiento tiene como principio rector que las instrucciones al jurado deben cubrir, si la prueba lo justifica, no sólo los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, sino también los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que bajo cualquier teoría razonable pueden estar presentes en las deliberaciones, aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. *Pueblo* v. *Prados García,* 99 D.P.R. 384 (1970); *Pueblo* v. *Tufiño Cruz,* 96 D.P.R. 225 (1968); *Pueblo* v. *Burgos,* 76 D.P.R. 199 (1954); *Pueblo* v. *Serbiá,* 75 D.P.R. 394 (1953); *Pueblo* v. *Méndez,* 74 D.P.R. 913 (1953); *Pueblo* v. *Galarza,* 71 D.P.R. 557 (1950). Ello es así porque corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos. La norma a este respecto fue claramente expuesta en *Pueblo* v. *Galarza,* supra:

"No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún

indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al jurado que incumbe determinar si tal prueba es cierta o no, y si la misma demuestra que el delito cometido fué homicidio voluntario y no asesinato.

Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el jurado, y no una de derecho a ser resuelta por el tribunal." *Pueblo* v. *Galarza,* a las págs. 561–562.

En el caso de autos, la prueba presentada por los apelantes, independientemente de su credibilidad, consistencia o debilidad, permitía al jurado, de darle este crédito, inferir los elementos de la súbita pendencia o de arrebato de cólera que justificaban la instrucción denegada por el delito de homicidio voluntario. Surge del testimonio del apelante Edwin González Colón que él se encontraba la noche de los hechos en el negocio de Agustín Rivera Martínez, cuando llegó al lugar un tal "Ciclón", quien le debía $10.00 a su hermano Javier. Edwin le exigió el pago de lo adeudado, surgiendo entonces una discusión entre ambos. Agustín intervino inmediatamente echándoles fuera del negocio y propinándole dos bofetadas a Edwin. En esos momentos llegaba Javier al lugar. Viendo que agredían a Edwin, se sumó de inmediato a la lucha. Isidoro, molesto porque le estaban "dañando el negocio" a su hermano Agustín, intervino entonces, asiendo fuertemente a Javier y lo invitó a pelear en un lugar cercano fuera del local. Aceptado el reto, partieron Javier y Edwin en el automóvil de aquél, e Isidoro y Norberto en el de este último.

Llegados al paraje escogido, iniciaron la lucha Javier e Isidoro, uniéndose a éste, muy pronto, Norberto. Cuando Edwin se aprestaba a intervenir en ayuda de su hermano, arribaron al lugar varias personas en otro automóvil e hicieron

un disparo. Edwin corrió entonces en busca de su hermano Alberto, a quien despertó diciéndole que mataban a Javier. Alberto le pidió a su mujer que buscara a William, hermano de Edwin, Javier y Alberto, y al padre de éstos, quienes vivían cerca, y, armándose de una escopeta, se dirigió con Edwin al lugar de los hechos. Al ver que cuatro o cinco personas agredían a Javier, hizo varios disparos con la escopeta.

La prueba de cargo confirma que, en efecto, los incidentes que culminaron en la muerte de Isidoro Rivera se iniciaron con la pelea en el negocio de Agustín, hermano del interfecto. Más aún, aunque el propio Ministerio Público se opuso a la solicitud de instrucciones por homicidio voluntario, admitió en su argumentación, sin embargo, que esta prueba contenía residuos de súbita pendencia: ". . . lo único que se ha introducido aquí con el propósito que fuere, fue una posible pelea o súbita pendencia que a través de un testimonio de uno de los acusados que en dos o tres minutos ahí habló de una pelea. La totalidad de . . . la casi totalidad 99.99 % de la prueba desfilada ha sido de homicidio, perdón, de asesinato en primer grado y no de homicidio". E.N.P., pág. 60.

Los apelantes tenían, pues, derecho a que el jurado considerara su teoría de defensa y aquilatara la prueba que ellos habían presentado. El tribunal de instancia les privó de ese derecho al denegar las instrucciones de homicidio voluntario, vulnerando así la garantía fundamental de un juicio justo.

En vista de la conclusión a que hemos llegado de ordenar la celebración de un nuevo juicio, consideramos conveniente discutir otros señalamientos de error, cuya dilucidación puede contribuir a acelerar los procedimientos.

### Comentarios al silencio del acusado

Los apelantes se quejan de que el tribunal de instancia permitió al Ministerio Público comentar el silencio de los acusados.

Se recordará que la versión de la prueba de los apelantes, según el testimonio de Edwin que ya conocemos, fue al efecto de que se vieron obligados a repeler una agresión contra ellos y a actuar en defensa propia como consecuencia de la cual se causó la muerte de Isidoro. A pesar de haber sido víctima de una agresión en la que se hicieron varios disparos, Edwin no acudió a la Policía a informar esos hechos para que investigaran el incidente. El fiscal, en su informe al jurado, trajo a colación esta conducta de los apelantes y en forma retórica se preguntó: "¿y los acusados le dijeron algo de eso que dijeron aquí a la Policía o se quedaron callados?" E.N., pág. 58. Más adelante, luego de que el tribunal declarara sin lugar la objeción de la defensa a dicho comentario, volvió el fiscal a repetir el argumento: "Me pregunto nuevamente. Ustedes lo oyeron. Una breve historia ahí . . . ¿hubo una querella? ¿Existe una querella en la Policía de que el muerto y el otro le dieron una pela? ¿Si hubo un tiroteo? ¿Por qué se quedaron callados? Pregúntenselo ustedes." *Id.*, pág. 59.

La contención de los apelantes es que estas manifestaciones del Ministerio Público constituyen un comentario al silencio de los acusados, vedado taxativamente por la Sec. 11 del Art. II de la Constitución del Estado Libre Asociado. ([1])

██ Generalmente esta disposición se aplica cuando el acusado no se sienta a declarar, *Pueblo* v. *Álvarez Trinidad*, 85 D.P.R. 593 (1962), aunque también hemos extendido su aplicación a los casos en que el acusado se sienta a declarar, retrotrayendo sus efectos a la etapa de la investigación policíaca y de la vista preliminar. *Pueblo* v. *Esquilín París*, 98 D.P.R 505 (1970). El acusado tiene, pues, pleno derecho de permanecer callado, no sólo en el juicio, sino también cuando la etapa de la investigación del delito se posa sobre él como un

---

([1]) La Sec. 11 del Art. II de la Constitución del Estado Libre Asociado dispone:

"Nadie será obligado a incriminarse mediante su propio testimonio y el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra."

sospechoso, y el ejercicio de ese derecho no puede utilizarse en su contra, ni como una admisión de culpabilidad ni para impugnar su credibilidad. *Id.* Los comentarios del fiscal en el caso de autos se refieren, sin embargo, a una etapa anterior a la investigación policíaca, cuando aún los apelantes no se consideraban sospechosos de delito, y, por lo tanto, fuera del ámbito de la prohibición constitucional.

Los argumentos del fiscal iban propiamente dirigidos a demostrar la falta de credibilidad de la prueba presentada por los apelantes, trayendo a la consideración del jurado una inferencia lógica que se derivaba de la conducta de ellos inmediatamente después de los hechos. Si en efecto los apelantes fueron víctimas de una agresión y hubo un tiroteo en que perdió la vida un ser humano, ¿no era lógico y razonable que los apelantes dieran parte a la Policía de lo ocurrido en vez de irse cada uno para su casa? Conforme surge de la prueba, el tiroteo ocurrió cerca de las dos de la mañana y no es hasta la seis de la mañana que la Policía llega a la casa del apelante Ramón González Malavé a efectuar el arresto. Pasaron cuatro horas sin que los apelantes hicieran gestión alguna para informar lo ocurrido a las autoridades.

El propósito de los informes finales del Ministerio Fiscal y la defensa al jurado es precisamente comentar la prueba presentada por las partes con las diferencias, deducciones y conclusiones que se derivan de ella, aun cuando los argumentos sean improbables, ilógicos, erróneos o absurdos. *Pueblo* v. *Fournier*, 80 D.P.R. 390, 407 (1958). El único requisito a este respecto es que el comentario tenga base en la prueba y, como hemos visto, los comentarios del fiscal en el caso de autos tenían amplio apoyo en la prueba desfilada.

Debemos advertir, sin embargo, que siendo el derecho del acusado de no incriminarse de tan fundamental importancia en nuestro ordenamiento, el Ministerio Público debe ejercer sumo cuidado al vertir sus comentarios sobre la conducta del

acusado por no haber éste limitado sus defensas o dado su versión de los hechos sino hasta el momento del juicio.

### Admisión en evidencia de fotografías

Otro motivo de error aducido por los apelantes es que el tribunal de instancia admitió erróneamente en evidencia fotografías cuyo único propósito, a juicio de ellos, era impresionar adversamente al jurado sin que las mismas tuvieran fines probatorios que las hicieran admisibles.

■ Como se sabe, el principio general es que las fotografías son admisibles en evidencia para demostrar el sitio donde se encontró el cadáver, el número de heridas y gravedad de las mismas, para corroborar el testimonio de un testigo y para cualquier otro propósito legítimo de la acusación. *Pueblo* v. *Rodríguez Colón*, 95 D.P.R. 614 (1967); *Pueblo* v. *Torres*, 75 D.P.R. 231 (1953); *Pueblo* v. *Zayas Ortiz*, 65 D.P.R. 538 (1946). Las fotografías deben ser excluidas, sin embargo, cuando se hayan ofrecido con el propósito primordial de crear pasión y prejuicio en el ánimo del jurado. *Pueblo* v. *Fournier*, supra, pág. 416.

En el caso de autos, las fotografías fueron presentadas para el legítimo propósito de corroborar el testimonio del patólogo forense en cuanto a las heridas que presentaba el cadáver y la forma en que éste había sido encontrado, por lo que las mismas eran admisibles como prueba. Notamos, además, en la exposición narrativa que a este respecto el tribunal de instancia impartió las instrucciones que aparecen a la página 41 del Libro de Instrucciones al Jurado para el Tribunal Superior de Puerto Rico.(²) Estas instrucciones advirtieron espe-

---

(²) La *instrucción impartida al efecto por el tribunal de instancia es* la siguiente:

"La[s] [ropa] [y fotografías] de la víctima se admiti[eron] únicamente con el propósito de ilustrar a los Señores del Jurado sobre el carácter y naturaleza de las heridas, móviles del delito, manera y medio en que se ocasionó [la muerte] [las heridas] o para demostrar la proximidad del acusado a la víctima al ocurrir [la muerte] [las heridas].

cíficamente al jurado del propósito legítimo de las fotografías admitidas en evidencia y les apercibió que no se dejaran impresionar indebidamente por las mismas. El efecto perjudicial de las fotografías, si alguno, quedó debidamente neutralizado con las instrucciones. ([3])

## Otros señalamientos

Los apelantes señalan varias actuaciones del tribunal de instancia relacionadas principalmente con la impugnación del testigo Norberto Rivera que maculan el derecho de ellos a un juicio justo e imparcial. El tribunal denegó la admisión en evidencia de la grabación del testimonio de Norberto en la vista preliminar, cuyo ofrecimiento tenía el propósito de demostrar que éste incurrió en serias inconsistencias en su declaración en el juicio. Dicho testigo intentó dar una explicación sobre estas inconsistencias y contradicciones que impensadamente el tribunal calificó de "fabulosa" y de "satisfactoria", invadiendo así la función adjudicativa del jurado.

La función de aquilatar y dirimir los conflictos en la prueba corresponde al jurado, y el juez debe abstenerse de expresar criterio alguno sobre la credibilidad de los testigos, pues tal actuación constituye una intervención impermisible en el ámbito de la función adjudicativa de los hechos.

---

"Con respecto a esta evidencia se les instruye que ustedes no deben dejarse impresionar indebidamente por la misma y que deberán considerarla en relación con el testimonio del testigo —————— y que corresponde única y exclusivamente a ustedes darle a dicha prueba la credibilidad o el valor probatorio que merezca."

([3]) Las Reglas de Evidencia de 1979 en nada alteran nuestra conclusión. Véanse las nuevas Reglas 80, 18 y 19 (32 L.P.R.A. Ap. IV, Rs. 80, 18 y 19). Bajo estas nuevas reglas las fotografías son admisibles cuando han sido debidamente identificadas o autenticadas y de conformidad con los criterios de pertinencia establecidos en la Regla 19. Es decir, pueden ser excluidas cuando el tribunal determine que su valor probatorio es de poca significación en relación con cualquiera de los siguientes factores: a) Peligro de causar perjuicio indebido; b) probabilidad de confusión; c) desorientación del jurado; d) dilación de los procedimientos; y e) innecesaria presentación de prueba acumulativa.

No tiene importancia el que el tribunal no impartiera instrucción sobre la exclusión del perito químico José H. Santiago, quien declaró al efecto de que él había hecho la prueba de parafina y ésta había dado un resultado positivo. Dicho testimonio fue eliminado a solicitud de los apelantes, porque el fiscal no probó que las muestras para el examen de laboratorio habían sido tomadas por el perito.

Los apelantes no han demostrado el perjuicio que la omisión de instrucciones pudiere haberles ocasionado. Más aún, no aparece de la exposición narrativa que ellos solicitaran instrucciones al respecto, a pesar de la oportunidad que le ofreció el tribunal de instancia. (E.N., pág. 61.)

*Se dictará sentencia que revoque las condenas por el delito de asesinato en primer grado y se devolverá el caso para la celebración de un nuevo juicio.*

El Juez Asociado Señor Díaz Cruz emitió opinión concurrente y disidente en parte a la cual se unió el Juez Asociado Señor Irizarry Yunqué. El Juez Asociado Señor Irizarry Yunqué emitió voto concurrente al cual se une el Juez Presidente Señor Trías Monge.

—O—

Opinión concurrente y disidente en parte del Juez Asociado Señor Díaz Cruz a la cual se une el Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 3 de abril de 1981

Isidoro Rivera Ortiz fue privado de su vida por acción violenta en la temprana madrugada del 10 de abril de 1978. La causa de su muerte fue un disparo de escopeta que desgarró su vena carótida y yugular. El cadáver tendido en el centro de la carretera en las cercanías de Aibonito, presentaba también tres heridas de bala en el centro de la espalda sin orificio de salida y una concentración de .08 de alcohol

por peso en la sangre. Por su muerte, y sobre el exclusivo testimonio de Norberto Rivera Martínez fueron acusados en cargos de asesinato en primer grado e infracción de los Arts. 4, 6, 8 y 8A de la Ley de Armas, Ramón González Malavé y sus hijos Javier, Edwin, Alberto y William González Colón. En el juicio, seguido ante jurado en los casos de asesinato y Arts. 8 y 8A Ley de Armas, la prueba del Estado y la defensa sostuvo teorías irreconciliables; la del Pueblo no produjo móvil alguno y situó a los acusados esperando en emboscada a su víctima, atrayéndolos a él y a su acompañante Norberto Rivera, con su automóvil detenido en carretera abierta y el motor con la tapa del bonete levantada, como en solicitud de ayuda; y que cuando se acerca la víctima a ayudarles, Javier González le hizo varios disparos de revólver de frente a Isidoro, casi a quema ropa, y mientras éste caía al suelo de espaldas, Alberto González lo remató con tiro de escopeta en la cara; y que después salieron de la oscuridad blandiendo machetes, los restantes miembros de la familia acusada.

La defensa descansó en el testimonio del co-acusado Edwin González quien declaró que en el negocio de terraza de Agustín Rivera se formó una discusión de tonos violentos como a la 1:00 A.M. de esa noche entre el testigo y un tal "Ciclón"; que el dueño del negocio le dio dos bofetadas a Edwin y los echó fuera; que intervino Isidoro (el occiso) cogió a Javier por la camisa y le dijo: "so mamao aquí no vamos a pelear más nada, no vengan a dañarle el negocio a mi hermano. Vámonos allá más arriba del puente a pelear." (E.N.P., pág. 35.) Y salieron desafiados en un carro los acusados Javier y Edwin, y en otro Norberto (testigo) e Isidoro; que al llegar arribita del puente los cuatro se enfrascaron en una pelea a puño cuando se presentó un tercer automóvil con cuatro o cinco individuos, uno de los cuales dijo: "todavía estos maricones quieren pelear" e hicieron un disparo; y entonces el testigo fue en busca de su hermano co-acusado Alberto a quien despertó diciéndole que mataban a Javier; que Alberto mandó

a su mujer a avisar al padre de los González, se armó de una escopeta y salió hacia el puente donde al llegar vio a su hermano Javier recibiendo castigo en desventaja e hizo varios disparos con la escopeta. El jurado trajo veredictos de asesinato en primer grado contra los hermanos Javier, Edwin y Alberto González Colón, y de culpabilidad por infracción de los Arts. 8 y 8A contra Javier y Alberto por lo que fueron sentenciados a cadena perpetua. La juez encontró a todos los acusados culpables de infracciones de Ley de Armas (*misdemeanor*) en que asumió jurisdicción como tribunal de derecho.

En su alegato los apelantes señalan los siguientes errores del Tribunal Superior: (1) tolerancia de comentarios insistentes del fiscal sobre el silencio de los acusados; (2) denegación de instrucciones de homicidio; (3) insuficiencia de la prueba que no excluyó la duda razonable; (4) admisión de fotografías sin más propósito que fomentar aversión y prejuicio en el jurado; y (5) violación del derecho de los acusados a un juicio justo e imparcial. Consideramos que la sala de instancia incidió en los extremos puntualizados por los señalamientos 2 y 5 formulados así:

*Segundo Error.*—Cometió error el tribunal a quo al denegar la solicitud de la defensa para que se dieran instrucciones de *homicidio*.

.    .    .    .    .    .    .    .

*Quinto Error.*—Las actuaciones del tribunal de instancia violaron el derecho de los acusados a un juicio justo e imparcial.

Introducida por la defensa prueba de que Alberto, llamado en su casa para que protegiera a su hermano Javier a quien varias personas agredían, al llegar al sitio efectivamente encontró a su hermano sucumbiendo en una pelea desigual, no puede descartarse el *arrebato de cólera* como impulso determinante de su acción disparando la escopeta, por lo que debió darse una instrucción de homicidio. Omitida esa instrucción no tuvo el jurado más alternativa en su veredicto que

culpabilidad en asesinato o absolución con la consecuencia de que una trifulca de cantina (no el asalto y asesinato brutal de estos días) resulta en cadena perpetua tanto para el que disparó la escopeta como para su hermano Edwin que no participó en el acto homicida. Los hechos relatados sitúan el acto criminal dentro de la clásica tipificación del homicidio: matar en ocasión de súbita pendencia o arrebato de cólera. Art. 85, Código Penal, 33 L.P.R.A. sec. 4004.

La súbita pendencia o arrebato de cólera que atenúa la responsabilidad penal del que mata a otro exige la existencia de un motivo legítimo y poderoso originado de acto cometido por el ofendido que al afectar al agente activo del delito sea suficiente para producir en su ánimo un estado de anormalidad rápido, momentáneo y pasajero; una ofuscación rápida y momentánea que afectando el estado normal de la inteligencia precipite al ofensor a obrar antes que la reflexión se imponga; un estímulo dimanante de hechos injustos que excite por modo violento el espíritu y ofusque la serenidad de la razón, que constituyan motivos realmente fundados, o sea los que a la mayoría de los hombres podrían arrebatar u obcecar. M. Rodríguez Navarro, *Doctrina Penal del Tribunal Supremo*, T. 1, pág. 938 y ss. Ver al padre, o hermano herido explica la reacción inmediata del agresor contra el que creía lo había sido de su padre, surgida en su ánimo con súbita viveza e intensidad bastante para perturbar momentáneamente su inteligencia y sobreexcitar su voluntad. (S. 4-3-1954, XXI Rep. Jurisp. Aranzadi 331, No. 521.) La creencia de que reñía la víctima con el hermano del agresor no constituye la realidad de una agresión que requiriese la defensa del pariente; pero sí es base de esta atenuante de arrebato u obcecación característica del homicidio, y no la agresión ilegítima, requisito de legítima defensa. Rodríguez Navarro, *op. cit.*, pág. 950. Es motivo poderoso y grave para apreciar el súbito arrebato la idea del peligro que corre el cuñado, en la desven-

tajosa posición en que se hallaba luchando con otro y debajo de él, y el natural deseo de librarle. *Ibíd.*, pág. 973.

El propio fiscal, combatiendo la inclusión de homicidio entre posibles veredictos, reconoció en la prueba un germen de pendencia o arrebato al decir: ". . . lo único que se ha introducido aquí con el propósito que fuere, fue una posible pelea o súbita pendencia fue a través de un testimonio de uno de los acusados que en dos o tres minutos ahí habló de una pelea. La totalidad de . . . la casi totalidad 99.99% de la prueba desfilada ha sido de homicidio, perdón, de asesinato en primer grado y no de homicidio". (E.N.P., pág. 60.)

La prueba demuestra que no es tan endeble el elemento de arrebato y que excede por mucho el décimo del uno por ciento que concedió el Ministerio Público. Sólo hay que recordar que la pelea en la terraza no fue invento del testigo acusado. La confirma Agustín Rivera Hernández, hermano del interfecto Isidoro Rivera, dueño del negocio al describir el incidente entre Edwin y "Ciclón" y al declarar que lanzó de su negocio a los desordenados y le dio una bofetada a Edwin porque éste le dijo "cabrón". (E.N.P., pág. 9.)

Nuestra jurisprudencia es constante y categórica en cuanto a la necesidad de una instrucción de homicidio porque "[a]un cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte". *Pueblo* v. *Serbiá*, 75 D.P.R. 394, 398 (1953); y no obstante la prueba demuestre de manera abrumadora que se había cometido un asesinato más bien que un homicidio. Adoptamos la norma de *Stevenson* v. *United States*, 162 U.S. 313, 314 (1896), que la enunció así:

No es necesario que la prueba de homicidio resulte incontrovertida o concluyente sobre la cuestión; mientras haya algún indicio de prueba a ese efecto, el jurado es el llamado a aquilatar la misma. De haber alguna evidencia tendiente a demostrar un estado de hechos que haga caer el caso dentro de la definición de homicidio voluntario, es al jurado que incumbe determinar si tal

prueba es cierta o no, y si la misma demuestra que el delito cometido fué homicidio voluntario y no asesinato.

.     .     .     .     .     .     .     .

Para la corte la prueba puede tender a demostrar de manera abrumadora que se trata en verdad de un asesinato, y no de un homicidio o de un acto de defensa propia. Empero, mientras haya alguna prueba pertinente a la cuestión de homicidio, la credibilidad y peso de la misma es cuestión a ser determinada por el jurado, y no una de derecho a ser resuelta por el tribunal. *Pueblo* v. *Galarza,* 71 D.P.R. 557, 561-2 (1950).

Finalmente, dijimos en *Pueblo* v. *Tufiño Cruz,* 96 D.P.R. 225, 229 (1968), citando con aprobación de *Pueblo* v. *Burgos,* 76 D.P.R. 199, 202 (1954), que "[a]unque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad, el acusado tiene derecho a que su teoría sea presentada al jurado mediante instrucciones apropiadas".

El debido proceso quedó fatalmente vulnerado por una serie de incidentes en que la juez bien directa o indirectamente resolvió conflictos en la prueba que competía resolver al jurado.

La defensa impugnó la credibilidad del testigo presencial de cargo Norberto Rivera quien en la declaración jurada al fiscal investigador dijo que ya caído Isidoro, el co-acusado Alberto González, escopeta en mano apuntándole, le dijo: "esto no es contigo, échate a un lado, los estábamos esperando". El punto es vital porque la prueba de defensa tendió a establecer que Alberto fue llamado en su casa por su hermano Edwin para que ayudara a Javier. El testigo impugnado declaró en la vista preliminar, según aparece en la grabación oficial, que fue Javier el de la expresión "los estábamos esperando", después que disparó el revólver; que nadie más habló. (E.N.P., págs. 44–49.) Luego en el juicio cambia por segunda vez de versión y le dice al jurado que Alberto, el de la escopeta, fue quien habló para decir "los estábamos esperando". (E.N.P., pág. 19.) Explica el testigo que se había confundido en la vista preliminar, a pesar de que se le dio a

leer su primera declaración al fiscal y de que la taquígrafa de fiscalía leyó sus notas originales de lo declarado por este testigo, quien entonces no tuvo más explicación que imputar error a fiscalía. Ocurre lo siguiente ante el jurado:

Juez: Qué más quiere la defensa?

Lcdo. Torres: Impugnar al testigo Su Señoría y podemos decir lo que ocurrió . . . al Tribunal.

Juez: Ya él ha admitido haber hecho la manifestación *y dado una explicación fabulosa.* (E.N.P., pág. 20.) (Énfasis nuestro.)

Luego, mientras declara llamado por la defensa el Juez de Distrito, Sr. Campoamor Redin, quien presidió la vista preliminar, interrogado sobre cuál de los acusados señaló el testigo del Pueblo como diciendo en los instantes del crimen "los estábamos esperando" si Javier, o si Alberto a quien le atribuyó la frase en su declaración jurada, surge este incidente:

Defensa: Le pregunto Hon. Juez, si el incidente que se suscita y que intervino doña Margarita Rodríguez, Taquígrafa de Fiscalía, es que en la vista preliminar el testigo Norberto Rivera dijo que quien había hecho las manifestaciones de que "los estábamos esperando" había sido el acusado Javier González y no el acusado Alberto González como él había dicho en su declaración jurada.

Testigo: Bien, en cuanto a ese punto es cierto lo que dice el compañero. No podría aseverar que fueron los nombres que me dice el compañero porque no los recuerdo, pero sí que se suscitó un incidente de esa naturaleza.

Defensa: Usted podría decirle a las damas y caballeros del jurado no recordando usted los nombres que el incidente suscitado fue uno en que el testigo decía que uno de los acusados había hecho unas manifestaciones y en su declaración que quien las había hecho era otro de los acusados.

Juez: *No conteste testigo. Ya el propio testigo Norberto Rivera contestó eso y dio una explicación satisfactoria. La defensa indica que pretende cuestionar esa explicación y no se le permite.* (E.N.P., pág. 57.) (Énfasis nuestro.)

Igual efecto disolvente de la credibilidad de la defensa y revelación por la magistrado al jurado de su opinión sobre

la falta de veracidad en su prueba se deriva del interrogatorio por la juez del testigo co-acusado Edwin González, luego que el fiscal renunció a contrainterrogarlo. El testigo de defensa ha declarado ante el jurado que además de Isidoro (occiso) y Norberto había otra gente que completaban 4 ó 5 encima de Javier pegándole y el récord recoge el siguiente interrogatorio:

Juez: Y cuando usted llega acá con Alberto además de Isidoro y Norberto ¿había otra gente más?

Testigo: Había otra gente más.

Juez: Usted conoce a esa gente?

Testigo: No, los otros no puedo decir quiénes eran.

Juez: ¿No son de su barrio?

Testigo: No . . .

Juez: ¿Cuánto tiempo hace que usted vive en este barrio?

Testigo: Toda mi vida.

Juez: Toda su vida ¿Y usted no sabe si los otros que estaban encima de Javier eran del barrio?

.    .    .    .    .    .    .    .

Juez: Y habían cinco encima de Javier.

Testigo: Habían como 4 ó 5.

Juez: Dígame ¿Y a Javier lo llevaron al Hospital por alguna herida?

Testigo: No, señor.

Juez: Por ninguna ¿Por algún rasguño?

Testigo: Estaba todo agolpiado, todo machucao, pero no se llevó al Hospital.

Juez: *No lo llevaron al Hospital.* Muchas gracias.

(E.N.P., págs. 37–38.) (Énfasis nuestro.)

La credibilidad del testigo Norberto Rivera está también cuestionada en otros aspectos de su testimonio, como su insistencia en que el apelante Javier le disparó a Isidoro frente a frente y que éste cayó de espaldas (E.N.P., pág. 18), mientras el protocolo de autopsia describe esas heridas de bala en la espalda, sin orificio de salida (E.N.P., pág. 4). Correspondía al jurado evaluar su testimonio integralmente sin la

prestigiosa influencia de criterio revelado por el juez de derecho.

La intervención del magistrado en el interrogatorio del acusado debe limitarse a esclarecer su testimonio, sin llegar al extremo de desacreditar su teoría de defensa y a sembrar dudas sobre la verosimilitud de su versión de los hechos. Cuando esto ocurre la actuación del juez constituye error perjudicial revocable, aun cuando no hubiese sido oportunamente objetada. *Pueblo v. Nieves Alvelo*, 89 D.P.R. 47, 49 (1963). El juez debe mantenerse dentro de normas de sobriedad y equilibrio que le impiden sustituir, en vez de complementar, la labor del fiscal o del defensor. *Pueblo v. Pabón*, 102 D.P.R. 436, 440 (1974).

Al juez resolver y decir que el principal testigo de cargo había dado una explicación "fabulosa" a las discrepancias entre su declaración en la vista preliminar y en el juicio está resolviendo el conflicto de credibilidad y trasmitiéndole al jurado su criterio respecto al fundamental extremo. Fue el juez y no el jurado quien dirimió el conflicto. *Cf. Pueblo v. Sáenz Forteza*, 100 D.P.R. 956 (1972); *Pueblo v. Túa*, 84 D.P.R. 39, 50 (1961); *El Pueblo v. Rosado*, 17 D.P.R. 441, 452 (1911); *El Pueblo v. Villegas et al.*, 6 D.P.R. 223 (1904).

Bajo cualquier sistema de juicio por jurado la influencia sobre éste del juez que preside es necesaria y propiamente de gran peso y la intimación de su criterio se toma con deferencia y puede resultar decisiva. *Hicks v. United States*, 150 U.S. 442, 452 (1893); *Starr v. United States*, 153 U.S. 614 (1894). El criterio subjetivo del juez en la valoración y adjudicación de credibilidad de la prueba presentada está fuera de lugar en sus instrucciones al jurado. *United States v. United States Gypsum Co.*, 438 U.S. 422, 460 (1978).

La juez, inadvertidamente, pero de modo eficaz, dejó pleno conocimiento en el jurado de su criterio de negación de toda credibilidad a la prueba de defensa.

La Constitución no hay que tomarla como muro que es necesario escalar antes de que pueda imponerse la sanción penal al ofensor del orden en el régimen de derecho. Los derechos del acusado en el juicio criminal son parte de una Constitución dinámica que pertenece a la generación del presente, por lo que esos derechos fundamentales operan y se implementan dentro de la circunstancia vital contemporánea, con un sentido de afinidad e integración a esa realidad. Es dentro de ese cauce interpretativo que le corresponde al tribunal de apelación determinar cuándo un juicio ha sido matizado por error que en grado e intensidad alcance el efecto de error perjudicial, irreconciliable con el debido proceso, y que imponga la revocación del veredicto o fallo. En ocasiones se incurre en error aislado cuya carga de erosión de las garantías constitucionales o estatutarias no produce necesariamente el colapso del trato justo y de acuerdo a la ley que es signo del juicio criminal. Mas la reiteración de ese tipo de error tiene el efecto acumulativo de enervar el amplio espectro de legalidad, el nervio central de debido proceso sobre el cual descansan la sentencia y la facultad moral y ética para quitar la libertad a un ciudadano. Por el efecto acumulativo de la reiteración, aun de errores disímiles, el error aislado no-perjudicial adquiere proporción y relieve de error que transgrede las garantías básicas y requiere la anulación del juicio.

A ese desenlace conducen las incidencias de este proceso en que la involuntaria revelación por la juez al jurado, en un conjunto de incidentes, de su criterio de credibilidad respecto a los testigos de cargo y de defensa, efectivamente redujo a inoperante la función del jurado a quien se le ofreció ya resuelta y adjudicada por la magistrado, la credibilidad de los dos únicos testigos producidos uno por el Estado y otro por la defensa, como presentes en el momento del crimen, instrumentos de evidencia directa.

El juez que preside un juicio criminal por jurado tiene la suprema encomienda de evitar que el culpable escape al cas-

tigo o que el inocente lo sufra. Mas esa determinación de encauzar el proceso hacia un veredicto justo está moderada por el mandato constitucional de que sea el jurado, y no el juez, quien adjudique la credibilidad de los testigos y resuelva los conflictos en la prueba, libre de influencias o presiones. La gran deferencia que el jurado tiene para la sabiduría, el sentido de justicia y la competencia profesional del juez, lo inclinará a seguir el criterio del magistrado en la evaluación de la prueba si ese criterio llega a su conocimiento en términos definidos. En tal caso el acusado no habrá sido juzgado por sus pares, como fue su elección, y se habrá anulado el derecho a juicio por jurado por vía que no por ser indirecta sea menos efectiva en el resultado final.

Sin quererlo la ilustrada juez de instancia, en un proceso intelectual que se rebelaba contra ciertos aspectos que consideró de artificio en la evidencia, fue un poco más allá del punto inasible a que podía llegar sin desplazar con su propio criterio el criterio de las doce personas que juzgaban los hechos. La objetividad del juicio se alimenta de un cuidadoso celo por las proporciones de decisión dentro de las exigencias del debido proceso de ley. En la conducción del juicio podrá el juez moverse con libertad y sentido de proporción en el campo de gravedad cuyo núcleo es el debido proceso, sin romper la atadura gravitatoria.

Deberían revocarse las sentencias de asesinato y Arts. 8 y 8A, Ley de Armas, esta última con pena de 10 a 25 años, 25 L.P.R.A. sec. 418a, y ordenarse un nuevo juicio para Javier, Edwin y Alberto González. Las dictadas en cargos ventilados por tribunal de derecho serían confirmadas.

—O—

Voto concurrente del Juez Asociado Señor Irizarry Yunqué al cual se une el Juez Presidente Señor Trías Monge.

San Juan, Puerto Rico, a 3 de abril de 1981

Estoy de acuerdo con el resultado a que se llega en la opinión del Tribunal, pero no puedo suscribir los comentarios que se hacen sobre el silencio del acusado.

Considero que estos comentarios son innecesarios en vista de que se están revocando las convicciones y se ordena celebrar nuevo juicio. Considero, además, que por vía de *dictum* se está reconociendo una excepción a la prohibición constitucional sobre comentar el silencio del acusado y se está haciendo una inferencia de culpabilidad a base de ese silencio, que es más grave aún. Veamos.

La prohibición contenida en la Carta de Derechos de la Constitución, Art. II, Sec. 11 (tercer inciso), es terminante y no está sujeta a condiciones. Dice:

Nadie será obligado a incriminarse mediante su propio testimonio y *el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra.* (Énfasis suplido.)

La opinión de este Tribunal tiene el alcance de enmendar por adición dicha disposición constitucional, pues establece como excepción que podría comentarse el silencio del acusado si éste se produce en "una etapa anterior a la investigación policíaca". Así se desprende del siguiente comentario, pág. 819, en la opinión: "Los comentarios del fiscal en el caso de autos se refieren, sin embargo, a una etapa anterior a la investigación policíaca, cuando aún los apelantes no se consideraban sospechosos de delito, y, por lo tanto, fuera del ámbito de la prohibición constitucional."

En cuanto a la inferencia de culpabilidad a base del silencio del acusado, queda plasmada en las siguientes expresiones, que aparecen en la misma página:

Los argumentos del fiscal iban propiamente dirigidos a demostrar la falta de credibilidad de la prueba presentada por los apelantes, trayendo a la consideración del jurado una inferencia lógica que se derivaba de la conducta de ellos inmediatamente después de los hechos. *Si en efecto los apelantes fueron víctimas de una agresión y hubo un tiroteo en que perdió la vida un ser humano, ¿no era lógico y razonable que los apelantes dieran parte a la Policía de lo ocurrido en vez de irse cada uno para su casa?* Conforme surge de la prueba, el tiroteo ocurrió cerca de las dos de la mañana y no es hasta las seis de la mañana que la Policía llega a la casa del apelante Ramón González Malavé a efectuar el arresto. Pasaron cuatro horas sin que los apelantes hicieran gestión alguna para informar lo ocurrido a las autoridades. (Énfasis suplido.)

En *Pueblo* v. *Alvarez Trinidad,* 85 D.P.R. 593, 598 (1962), dijo este Tribunal:

Hay que suponer que cuando nuestra Convención Constituyente se reúne, tiene conocimiento tanto de nuestras anteriores disposiciones constitucionales y estatutarias del 1917 y del 1902 como de nuestras decisiones del 1937 y 1949, en cuyas últimas se adoptó la regla pragmática de inmediata recriminación e instrucción especial. El énfasis que contiene el inciso II del Art. II de nuestra Constitución, en el sentido, que "el silencio del acusado no podrá tenerse en cuenta ni comentarse en su contra" parece resumir la moderna tendencia de evitar todo riesgo inquisitorial en nuestro proceso de investigación criminal, y toda admisión por Silencio.

Es de notarse que las manifestaciones del fiscal a que aquí aludimos, hechas en su informe al jurado, son, además, injustas si han de tomarse para impugnar la credibilidad del coacusado Edwin González Colón, único que declaró en el juicio. He leído la detallada exposición narrativa y no aparece que se sentara base alguna para dicho argumento. De hecho, el fiscal le hizo muy pocas preguntas al testigo al contrainterrogarle, y en ninguna de ellas le inquirió por qué no fue a la Policía a relatar los hechos. Si este testigo no tuvo la oportunidad de dar explicación alguna sobre su silencio, mucho

menos la tuvieron los otros acusados, quienes no ocuparon la silla testifical. ¿Estaba autorizado el jurado para inferir su culpabilidad porque guardaron silencio? Esa es la implicación que a mi juicio se deriva de los comentarios que en la opinión se hacen. Me parecen improcedentes, contrarios al fundamental principio constitucional aludido, y no puedo suscribirlo.