EL PUEBLO DE PUERTO RICO, apelado *v.* ERNESTO CEPEDA RIVERA, acusado y apelante.

Número: CR-88-24     Resuelto: 16 de enero de 1990

*Roberto L. Varela Muñiz, Zinia I. Acevedo Sánchez, Carmen Ana Rodríguez Maldonado* y *Enrique Rivera Mendoza,* abogados del apelante; *Norma Cotti Cruz, Subprocuradora General, Blanca A. Díaz Segarra* y *Anabelle Rodríguez Rodríguez, Procuradoras Generales Auxiliares,* abogadas de El Pueblo.

## SENTENCIA

### I

El Ministerio Fiscal acusó a Ernesto Cepeda Rivera de asesinato en primer grado por la muerte de su esposa Ada Carenia Reyes Sánchez.

Previo juicio, el Jurado rindió veredicto de culpabilidad y fue sentenciado a cumplir pena de noventa y nueve (99) años de reclusión.

Inconforme, en apelación cuestiona, en síntesis, la negativa del tribunal sentenciador a que el Jurado escuchara una grabación de una vista de desalojo en un trámite judicial previo de divorcio, y ciertas instrucciones brindadas. Aunque nos solicita la revocación y la celebración de un nuevo juicio, su extensa argumentación no niega haber producido la muerte de su cónyuge, sino el veredicto de asesinato en primer grado frente a la posibilidad de uno por homicidio voluntario.

El examen de sus señalamientos nos mueve a transcribir directamente de su Alegato de 22 de febrero de 1989, págs. 2–15, el resumen de la prueba. Veamos.

## A. *PRUEBA DE CARGO*
### BENJAMIN RIVALTA LOPEZ

Atestiguó ser abogado de profesión y haber conocido al acusado en 1986, por razón de un caso de divorcio en el cual representó a la esposa de éste. Señaló que en dicho proceso presentó una moción de desalojo contra el acusado pero eventualmente se desistió del caso. Continuó declarando que veía a doña Ada C. Reyes Sánchez, la víctima en el present[e] caso, esporádicamente ya que ella tenía negocios y ocasionalmente le visitaba. Que a principios de marzo de 1987 la perjudicada regresó a donde [sic] él, pues deseaba iniciar los trámites del divorcio debido a que alegadamente recibió una golpiza de parte de su esposo.

Declaró que presentó la demanda de divorcio contra el acusado junto a una moción de desalojo. Que el 31 de marzo de 1987 se celebró la vista de desalojo donde compareció el acusado sin representación legal, y el juez le dijo que tenía hasta las seis de la tarde (6:00 P.M.) para desalojar la vivienda. Atestó que al finalizar la vista el acusado estaba indignado, que manifestó algo así como: "esto es una injusticia porque yo no tengo a donde irme". Que alegadamente *cuando el acusado se marchaba de sala* manifestó "que él iba a resolver el problema y le iba a dar una solución definitiva".

Indicó que volvió a ver a doña Ada el mismo día por la tarde en el Tribunal. Que ella alegadamente estaba nerviosa porque el acusado la había amenazado. Que le indicó que esperara hasta las seis de la tarde (6:00 P.M.) y fuera con un policía. Que vi[o] a la Sra. Reyes Sánchez por última vez el 31 de marzo en la tarde; al día siguiente se enteró que había muerto y fue a la funeraria.

Manifestó que la demanda de divorcio presentada en marzo de 1987 era por la causal de trato cruel, basada en agresiones físicas y en consistentes [sic] imputaciones de que la perjudicada le era infiel y él le pedía que dejara de trabajar.

Durante el contrainterrogatorio aceptó que en 1986 presentó contra el acusado una demanda de divorcio por la causal de trato cruel, y se desistió de la misma por reconciliación de las partes. Declaró que en la vista del 31 de marzo de 1987 el acusado estaba bien nervioso. Declaró que el acusado no mencionó los celos pero dijo que su esposa llegaba tarde y no lim-

piaba la casa. Que a finales de la vista se produjo un incidente, con una cortina de baño que el acusado llevó para demostrar que doña Ada no limpiaba la casa. Que no recordaba si el acusado le imploraba al juez que lo divorciase ese mismo día. Que lo único que recordaba con claridad fue el incidente de la cortina y el comentario de que era una injusticia. Atestó que sigue siendo el abogado de la familia para la declaratoria de herederos, la liquidación de bienes gananciales y en una demanda por daños y perjuicios.

### SATURNINO REYES TORRES

Declaró que la occisa doña Ada C. Reyes Sánchez, era su hija y el acusado su yerno. Que el 31 de marzo de 1987 se encontraba en la marquesina de su casa y el acusado llegó y le dijo que el Juez le había ordenado que entregara la casa a doña Ada. Que el acusado le dijo que fuera a hablar con el juez por lo que pudiera suceder y él le contestó que no podía hacer nada. Atestiguó, que al día siguiente el conductor del camión de basura le contó que en Rosalía habían matado una mujer que vendía filtros y en seguida supo que se trataba de su hija. Que había visto con vida a su hija por última vez dos (2) días antes.

Al ser interrogado admitió que el 31 de marzo, como a las once de la mañana (11:00 A.M.), el acusado le pidió que fuera a hablar con el juez. Que no sabía para qué quería que fuera a hablar con el juez. No sabía si el acusado quería utilizarlo como testigo para refutar la orden.

Manifestó que acostumbraba a jugar dominó con el acusado y que esa misma tarde jugaron dominó. Que él y el acusado se llevaban bien. Que el acusado era un hombre trabajador y lo conocía desde pequeño.

### LIZZETTE BAERGA REYES

Declaró que la perjudicada era su madre y el acusado su padrastro. Que vi[o] con vida por última vez a su madre el día antes de su muerte. Que ese día la vi[o] por primera vez al medi[od]ía. Que estaba en el carro con su madre y los nenes; fueron a Luquillo y luego se dirigieron a Caguas. Se dirigieron al Tribunal de Caguas donde se encontraron con el Lcdo. Rivalta. Luego de hablar con el Lcdo. Rivalta fueron a hablar con unos policías en la Plaza de Juncos y le preguntaron qu[é]

podían hacer, ya que el acusado tenía un arma y temían por la seguridad de la perjudicada. Que los policías le respondieron que no podían hacer nada y ninguno quiso acompañarles a la casa.

*Atestiguó que se encontraron con el acusado quien . . . siguió mandándola[s] a detenerse; le preguntó a la perjudicada qué iba a hacer y le pidió que fuera a la casa de ellos, pues quería hablar con ella. Que su mamá le pidió que la acompañara a la casa para ver qué quería el acusado.* Al llegar a la casa, su mamá entró y ella se quedó en el carro. Manifestó que dentro de la casa, escuchó al acusado decir: "[¿] De todas maneras tengo que dejar la casa?" Y la perjudicada le contestó: "Bueno t[ú] escuchast[e] lo que dijo el juez". Que el acusado le dijo que ese juez era injusto y su madre le dijo que tenía hasta las seis de la tarde (6:00 P.M.). *Que escuchó al acusado decir que antes de dejar la casa prefería quedar viudo y preso.* Declaró que se encontraba en el carro a una distancia de treinta pies (30′) y veía a través de la ventana a su mamá y al acusado *discutiendo. Que escuchó al acusado decir que él no iba a dejar la casa con tanto trabajo que le costó hacerla, a lo cual su mamá le contestó que ella también aportó. Que no se iba a quedar con la casa y sólo era una determinación temporera en lo que se veía el divorcio.* Que el carro estaba apagado y el nene pequeño estaba con ella en la parte delantera y el grande entre los dos asientos. La testigo declaró que el sábado anterior a los hechos estaban ellas con los nenes en la casa y el acusado le preguntó a su mamá si iba a seguir con lo del divorcio, a lo cual la perjudicada contestó que s[í] y el acusado, mirando a la testigo, dijo: "después no digan que no se lo advertí".

Atestó que el día primero de abril, como de costumbre, esperaba a su mamá en horas de la mañana. Llegó una amiga de ella, junto a otra señora, quien habló con su esposo. Que al ver a su amiga llorando preguntó qué le había pasado a su mamá, por las amenazas que el acusado le había hecho. Le dijeron que había tenido una discusión y que ella no estaba viva. Que fue a casa de su mamá y vi[o] el cuerpo tirado al lado izquierdo de la casa en el lugar donde su mamá guardaba el carro. Declaró que al llegar al lugar habí[a] vecinos y estaba el señor Justino Garay.

Señaló que su madre tenía una agencia de pasajes, vendía filtros y ayudaba al acusado a cobrar. Que su mamá llegaba tarde porque iba a las diferentes líneas aéreas de San Juan a buscar pasajes para luego entregarlos. Expresó que a pedidos del acusado su mamá quitó la agencia para febrero de 1987.

Durante el contrainterrogatorio, declaró que volvió a ver a su madre como a las cuatro de la tarde (4:00 P.M.), dándole tiempo al acusado para que se fuera de la casa. Que le dijeron que su madre le había prestado el carro al sobrino del acusado y que alguien la llevó como a las ocho de la noche (8:00 P.M.). Indicó que su madre y el acusado *siempre habían discutido*.

## JUSTINO GARAY DIAZ

Declaró tener ochenta y u[n] (81) años de edad y ser residente del Barrio Rosalía de Juncos desde hace veinte (20) años. Indicó que conoce al acusado desde pequeño y a la perjudicada desde que fue a vivir al lado de él.

Atestiguó que el día primero de abril como a las siete y media de la mañana (7:30 A.M.) *escuchó dos (2) disparos*. Que su casa queda como a sesenta (60) pies de la del acusado y las separa una verja de alambres de púas. Que tardó un par de minutos en salir afuera *y vi[o] al acusado solo con un arma en la mano dirigiéndose al auto*. Le dijo que iba a buscar a alguien que lo llevara al cuartel porque iba a entregarse. *Vi[o] el cuerpo de la perjudicada tirado en el suelo y salió a llamar a la gente*.

Durante el contrainterrogatorio declaró que conoce al acusado desde pequeño, pues es una bella persona y un hombre trabajador. *Que no oyó discusión antes de o[í]r los disparos y anteriormente no había escuchado discusión entre ellos*.

## VIRGILIO PIÑEIRO GONZALEZ

Atestiguó que reside en el Barrio Mangó de Juncos y trabaja como guardia de seguridad. Que el día primero de abril se encontraba en el balcón de su casa; en los bajo[s] vive el teniente Cepeda, quien es hermano de su esposa y primo del acusado. Que su esposa y su suegra estaban hablando frente a la casa cuando llegó el acusado nervioso y desesperado buscando al teniente Cepeda porque había mat[ado] a su mujer. Que decidió llevarlo al cuartel. Por el camino le preguntó al acusado si sabía lo que había hecho y éste le respondió:

"c[ó]mo no voy a saber, lo que harías tú o cualquier otro hombre si se encontrase en la situación que me encuentro yo". El acusado alegadamente le dijo que la esposa lo tenía en una situación desesperada. Que estaba acostumbrad[a] a provocarlo de una forma terrible y demasiado fuerte, que no pudo soportarlo y cuando vino a ver la había matado. Cuando llegaron al cuartel el acusado entregó el paquete en el cual imaginaba tenía el arma.

Al ser contrainterrogado señaló que el acusado le dijo que la occisa estaba acostumbrada a provocarlo, pero ese día lo provocó de una forma terrible.

### BARTOLO ROJAS FIGUEROA

Declaró que está casado con la señora Lizzette Baerga Reyes e identificó al acusado. Indicó que unas semanas después de los hechos el acusado lo llamó a las oficinas donde trabaja para hablar de la muerte de su suegra. Le dijo al acusado que no tenía nada que hablar con él. Que un día, luego de esa llamada, vi[o] que el acusado le seguía y al ver que era el apelante se detuvo y le preguntó cómo había sucedido.

Durante el interrogatorio atestiguó que en la declaración jurada declaró que el acusado *le dijo que la había matado porque habían discutido, pero no se refería al día de los hechos*. Que anteriormente habían discutido pero no le habló de ese momento. Que no entraron en detalles ese día sobre la discusión y que la mató, pero no sabía a cuando [sic] se refería esa discusión.

### DR. RAFAEL RODRIGUEZ

Atestó que el día 10 de mayo de 1987 era el médico de turno en la Sala de Emergencia del Centro de Diagnóstico y Tratamiento de Juncos. Procedió a ver el expediente médico de la paciente Ada Reyes Sánchez correspondiente a dicha fecha. Señaló que en el expediente se indica que la paciente estaba ansiosa por [una] discusión [que tuvo] con [un] familiar. *Que el esposo le apretó las manos y sentía dolor, presentaba trauma en la mano derecha con hematomas en el quinto dedo.*

Durante el contrainterrogatorio señaló que no recordaba nada de la paciente. Que no podía haber tenido síntomas en ninguna otra parte del cuerpo de haber recibido una golpiza, porque hubiera sido anotado en el expediente. Que no detalla

la lesión en el quinto dedo de la mano derecha, pero si hubiese sido grave le hubiera referido a Rayos X.

### DR. FRANCISCO LANDRON GUARDIOLA

Atestiguó que es patólogo forense en el Instituto de Ciencias Forenses de Río Piedras y fue quien le hizo la autopsia a la occisa, Ada Reyes Sánchez, el día 1ro. de abril de 1987. Atestó que se encontraron tres (3) heridas de balas en el cuerpo, *una de ellas fue una herida de contacto compatible con un disparo hecho a una persona tirada boca abajo. Que la segunda herida de bala estaba localizada en el brazo izquierdo, la cual se consideraba una herida de larga distancia (más de dos (2) pies), ya que no se encontró grano de pólvora ni negro de humo en la piel. La referida herida era compatible a un disparo efectuado a una persona que va corriendo. Que la tercera herida de bala estaba localizada en la parte derecha de la cabeza, era considerada una herida de larga distancia y era compatible con un disparo hecho a una persona que va corriendo.* Que le dio un número a cada bala extraída, pero no necesariamente implica secuencia. En cuanto al examen externo, atestó que la perjudicada tenía una contusión en el pómulo derecho, una abrasión en la mejilla derecha, una abrasión en el dorso del brazo izquierdo, una abrasión con contusión en la rodilla izquierda y abrasiones lineales en la cara anterior de la pierna izquierda. Que la condición de los pómulos se debía a fracturas de cráneo por heridas de bala y era compatible con una caída o un golpe.

Durante el contrainterrogatorio señaló que no se puede determinar en la autopsia si las heridas tres (3) y dos (2) fueron antes de la herida de bala número uno (1). *Que cualquiera de las heridas de bala en la cabeza eran mortales.*

### AGENTE ROBERTO AGOSTO DEL VALLE

Atestiguó que trabaja en la División de Homicidios del C.I.C. desde el 1984. Que para el 1ro. de abril de 1987 trabajaba en la sección de [h]omicidios de Caguas y como a las ocho y veinticinco de la mañana (8:25 A.M.) se le encomendó que pasara al Distrito de Juncos, pues había sucedido un asesinato y una persona se había entregado en relación a esos hechos. Que se le notificó al fiscal Crespo y pasaron a observar el cadáver, el cual presentaba dos heridas de bala en la cabeza y una en el hombro izquierdo.

Que luego se dirigió al cuartel y el policía Figueroa le entregó un revólver marca Taurus, calibre 38; le indicó que el Sr. Ernesto Cepeda le había entregado el arma luego de manifestar que había matado a su esposa. Que la masa del revólver tenía tres casquillos de balas disparadas y dos mascadas; la masa del revólver era de cinco balas.

Declaró que el acusado tenía licencia de poseer y portar armas la cual entregó al C.I.C. Que fue al Instituto de Ciencias Forenses a recoger los proyectiles y los fragmentos de bala que había extraído del cadáver. Que lo habían llamado desde Juncos a la División de Homicidio del Cuartel de Caguas como a las ocho y veinticinco de la mañana (8:25 A.M.), pero no sabía si el acusado ya estaba en el cuartel. Se le indicó que el acusado se había entregado al policía Figueroa. Que en la División de Homicidios le hizo las advertencias de ley al acusado, el cual le respondió que esperaba a su abogado.

### ERNESTO J. BERRIOS

Se estipuló el testimonio del testigo B[e]rr[í]os, perito especialista en armas de fuego del Instituto de Ciencias Foren[s]es del Cuartel General de la Policía el cual haría un análisis del arma de fuego.

### B. PRUEBA DE DEFENSA
### ERNESTO CEPEDA RIVERA

Declaró que se dedicaba a la venta y cobro de purificadores de agua marca Elena; que no fue a la escuela pero su hermano l[e] enseñó a leer y no sabe escribir. Que ha trabajado como obrero de la caña y en otros menesteres.

En relación al incidente del 31 de marzo de 1987, declaró que tres (3) o cuatro (4) días antes se le entregó un emplazamiento para ese día. Que asistió a dicha vista con el señor Justino Garay como testigo. Que el Juez le preguntó si aún permanecía en la casa y le dijo que él no debía permanecer en la casa desde el primer momento en que recibió la citación. Atestó que él no dijo en la vista las palabras que el Lcdo. Rivalta declaró, que lo único que le pidió al juez fue una oportunidad para poder hablar y defenderse en su caso, y que le dejara utilizar al testigo que había llevado. Que el juez le dijo que la decisión ya estaba tomada. Decidió obedecer la orden pero le dijo al juez que la misma era injusta.

Que al salir del Tribunal se dirigió a su casa y a llevar a su vecino a la casa. *Que ese mismo día fue a hablar con Saturnino Reyes, el padre de la occisa.* Que le pidió que fuera con él a hablar con el Juez para que pudiera hacer algo sobre el particular, pues quería apelar el caso y llevarlo a él como testigo porque él sabía lo que estaba ocurriendo. Que don Saturnino le contestó que no podía hacer nada ya que la perjudicada era su hija y no iba a estar en contra de ella.

Atestó que fue a comprar alimentos para animales y *se encontró con la perjudicada* y la hija de ésta (Lizzette); se citaron para hablar. Cuando doña Ada llegó a la casa él estaba recogiendo algunas cosas porque *él es obediente de la ley.* Que su esposa le dijo que él no tenía que irse, buscó la tarjeta de medicaid y salió. Que se sintió tranquilo y fue a jugar dominó durante dos o tres horas; cuando terminó regresó a la casa y no había signo de que ella estuviera allí. Que su esposa llegó de madrugada y no sabe qui[é]n la llevó. Que la ve en la mañana del primero de abril y ella le dice que no tiene que irse pero tenía que soportar que ella saliera a bailar y que llevara a la casa las personas a "quien ella le diera la gana de llevar", de lo contrario él debía irse. Atestó que decidió irse de la casa y tenía el arma en la mano porque no la podía dejar. Que salió de la casa y doña Ada . . . siguió riéndose de él y profiriéndole palabras obscenas e insultantes; *que no soportó la situación y disparó.* Que se dirigió al carro y su vecino Justino Garay salió y le preguntó qué había hecho. Que en esos momentos estuvo con[s]ciente de lo que había hecho y decidió entregarse.

Durante el contrainterrogatorio del Fiscal, el testigo declaró que vivió con la occisa por seis (6) años y no procrearon hijos. Se le pregunt[ó] por sus matrimonios anteriores, y contesta que Doris fue su primera esposa. La [d]efensa objetó, el Tribunal declara [sin l]ugar la objeción. Que Doris se encuentra en los Estados Unidos. Que es correcto que él dijo al jurado que respetaba la ley. El Fiscal preguntó si es o no es cierto que agredía a Doris. La [d]efensa objeta por entender que no es relevante y por ser inuendos. El tribunal declara [c]on [l]ugar la objeción. La [d]efensa sigue objetando las preguntas en relación a la segunda esposa y solicita al tribunal le ordene al fiscal se concrete al interrogatorio directo. La [d]efensa continúa objetando y surge un planteamiento de de-

recho pues el Fiscal preguntó, y fue objetada la pregunta, si el acusado había sido denunciado por agresión física a su segunda esposa.

El Fiscal señaló que el testigo abrió las puertas durante el directo al decir que él era respetuoso de la ley, y deseaba impugnar al acusado en caso de que él negase que fue denunciado por su segunda esposa en un caso de agresión. La [d]efensa objeta por no ser relevante y confundir al jurado influenciando en el ánimo de éste. La [d]efensa solicita al Fiscal [que] le muestre los documentos que tenga para probar la supuesta denuncia.

El tribunal resolvió que la pregunta sobre la supuesta denuncia se permite en oposición a la manifestación gratuita del acusado de que él era una persona respetuosa de la ley. Que no era necesario que haya habido o no convicción, basta que se mencione el hecho y él lo acepte. Si no lo acepta es entonces cuando el Ministerio Público tiene que presentar la denuncia aunque ésta hubiese sido retirada.

La [d]efensa solicita reconsideración por entender que la pregunta es de escaso valor y su único efecto era confundir al jurado. Solicitó que al menos se presentaran los documentos. El Tribunal declaró [s]in [l]ugar la reconsideración.

*El testigo declaró que es cierto que antes de separarse de su esposa Elsie ella presentó una querella en contra de él, pero como no era cierta la quitó.*

El testigo continuó declarando que es correcto que el 31 de marzo de 1987 durmió en su casa; que era cierto que el juez le ordenó irse antes de las seis de la tarde (6:00 P.M.). Que se quedó porque su esposa le dijo que no tenía que irse. Que la occisa no le enseñó a leer. Que es cierto lo de la vista del 31 de marzo de 1987 y que el Lcdo. Rivalta y su esposa se encontraban en dicha vista.

El Fiscal comenzó a preguntarle al testigo sobre lo declarado por el Lcdo. Rivalta. El acusado declaró que es correcto que le declaró al jurado que lo dicho por el licenciado Rivalta no era cierto. Que era cierto lo que declaró el Lcdo. Rivalta de que estaba en la vista con su esposa; añadió el acusado que parte era cierto, y parte no. El Fiscal comenzó a interrogar al testigo sobre algunas de las declaraciones del Lcdo. Rivalta a lo cual el testigo admitió que esa parte era cierta. La [d]efensa

objeta señalando que el testigo había manifestado que parte
del testimonio del Lcdo. Rivalta era cierto y la línea del con-
trainterrogatorio iba dirigida a demostrar que el acusado ha-
bía dicho que todo lo declarado por el Lcdo. Rivalta era falso.
El Tribunal declara [s]in [l]ugar la objeción. El Fiscal conti-
nuó interrogando sobre parte del testimonio del Lcdo. Ri-
valta, a lo cual el testigo señalaba que todo ello era correcto.

El testigo es interrogado en torno a su testimonio durante
el directo. Señala que es cierto que el 31 de marzo de 1987 se
encontró con la perjudicada frente a la plaza. Que es cierto
que cuando ella llegó a la casa él estaba allí. Que ella salió
rápido porque fue a buscar la tarjeta de medicaid. Que no re-
cuerda si el [j]uez le dijo que la orden era provisional y que la
decisión de apelar era suya. Que es cierto que ese día fue a
jugar dominó con el padre de la perjudicada durante dos o
tres horas. Que regresó a la casa de ocho y media a nueve de la
noche (8:30–9:00 P.M.) Que es cierto que durmió esa noche en
la casa. *Que en la mañana estaba recogiendo ciertas cosas
para llevarse y también tomó el revólver porque no podía de-
jarlo en la casa. Que no hizo gestiones con la policía para
sacar el arma de la casa.* Que cuando llegó a la casa del Te-
niente Cepeda le informaron que no podía sacar el arma de la
casa sin permiso, pero se enteró de eso después de los hechos.
*Declaró que la occisa le dijo que no tenía que irse por el mo-
mento, que ella había sido una mujer buena y lo había respe-
tado siempre. Que crió los hijos de él de su segunda esposa y
fue buena con ellos.* Que ella le dijo que podía quedarse, pero
con los términos que ella le daba no podía quedarse. *Que la
occisa en ningún momento salió corriendo. Que él cogió el
revólver y ella se le rió en la cara.* Que ella le siguió informán-
dole las condiciones bajo las cuales podía quedarse. Que él
siguió hacia el auto y ella siguió riéndose y diciéndole palabras
obscenas. Que el incidente *sucedió fuera de la casa, en la
guardarraya con la casa de Don Justino. Que él contestó las
palabras con el arma.* Que él no sabe d[ó]nde le pegó el pri-
mer tiro porque estaba casi junto a él, estaba como un loco,
que estaba ciego y él en su vida jamás pensó que él iba [a]
hacer algo como eso.

El testigo declaró que escuchó el testimonio del patólogo
sobre la distancia a que hicieron los disparos; que recuerda

que el testigo señaló que un tiro era compatible con una persona que iba corriendo. Que recuerda que el testigo Bartolo Rojas declaró, que cuando se encontró con el acusado en Las Piedras éste le contó que cuando cogió el arma ella salió corriendo y él disparó. Declaró que recuerda dicho testimonio pero que ello no es cierto. *Que le dijo a Kenneth Cruz, quien es el hijo de la occisa, cómo habían ocurrido los hechos.* Que es lo mismo que le ha dicho al jurado. *Que no se explica los tiros en la espalda;* que no sabe si fueron de frente [o] de lado, ni d[ó]nde cayeron las balas porque ellos estaban enfrascados. Que no recuerda lo del cañón pegado en la cabeza porque estaban enfrascados. Que él no sabe explicar cómo pasó porque él no sabía lo que estaba haciendo; que en ese momento no estaba cuerdo. Que al momento de montarse en el auto fue que comenzó a darse cuenta de lo que había hecho. El testigo es contrainterrogado nuevamente sobre la forma en que ocurrieron los tiros y manifiesta no recordar. Que él salió primero y ella le siguió con la intención de humillarlo. Declaró que las balas estaban mascadas hacía dos o tres meses, que estaban mascadas desde que fue al Club de Tiro. Que siempre tenía el arma cargada. Que no le contó al Sr. Justino Garay lo sucedido. Que a Virgilio Piñeiro le contó muy poco. Que a Kenneth Cruz, hijo de la perjudicada, le contó los hechos. Que es cierto que habló con Bartolo Rojas en Las Piedras.

### ANTONIO VELAZQUEZ SABALA

Testigo de reputación de la [d]efensa. Atestiguó que conoce al acusado desde bien niño y siempre ha vivido cerca de él. Que es un hombre recto y trabajador. A preguntas del Fiscal ofreció los nombres de algunas personas que hablan bien del acusado.

### C. *PLANTEAMIENTO DE DERECHO*

La [d]efensa solicita que se permita al jurado escuchar la grabación de los procedimientos del 31 de marzo de 1987 ante el Honorable Juez Tomás Torres Marrero. El Ministerio Público objeta fundamentándose en la Regla 19 de Evidencia, y porque dicha prueba podría causar confusión en el jurado. La [d]efensa argumenta que dicha prueba es pertinente y relevante por existir controversia entre los testimonios del Lcdo. Benjamín Rivalta y del acusado en relación a lo sucedido en

dicha vista. El Tribunal iba a permitir que el jurado escuchara la grabación y posteriormente se revocó.

### D. PRUEBA DE REFUTACION
### KENNETH CRUZ

Declaró que el día 31 de enero de 1988 el acusado le contó la forma en que ocurrieron los hechos. Que el acusado le dijo que esa mañana se preparaba para irse de la casa y tenía todo listo y que estaba hablando con su mamá. *Que el acusado le dijo que cogió el arma y la mamá salió corriendo de la casa, él salió detrás y le pegó los tiros. Que el acusado le dijo que había hecho los tiros saliendo de la casa detrás de ella.*

Durante el contrainterrogatorio de la [d]efensa declaró que había hablado con los fiscales del caso ese día. Que no prestó declaración jurada sobre los hechos. Que habló con los fiscales de que el acusado le había contado los hechos. Que el acusado le dijo que el día [de] los hechos él y su mamá estaban hablando y no discutiendo, pero no le dijo de qué hablaban. *Que el acusado se disculpó por lo que había hecho y se notaba arrepentido.* (Énfasis suplido.)

### II

A. Cometió error de derecho el Honorable Tribunal sentenciador al no permitir que el Jurado escuchara la grabación de la vista de desalojo celebrada el 31 de marzo de 1987 ante el Honorable Juez Tomás Torres Marrero, en el Tribunal Superior, Sala de Caguas. Alegato del apelante, pág. 15.

Según lo antes reseñado, este incidente cobra vida en ocasión del testigo de cargo, licenciado Rivalta López, atestar que como resultado de una vista de desalojo, luego de finalizada, *al abandonar* dicho recinto el acusado Cepeda Rivera dijo que "iba a resolver ese problema, que iba a darle una solución definitiva". E.N.P., pág. 2. Aduce que ello fue "crucial para lograr la convicción por asesinato en primer grado" —Alegato del apelante, pág. 22— por razón del elemento de deliberación, y por ende resultaba indispensable la presentación de la grabación de dicha vista para así impugnar la credibilidad del licenciado Rivalta López, ya que él

negó haberlo hecho. Insiste en que, de haberse permitido, "[c]on toda probabilidad el veredicto del jurado hubiese sido distinto". Alegato del apelante, pág. 22. No tiene razón.

En primer lugar, es obvio que la expresión que le fue atribuida no formaba parte del récord grabado, pues ocurrió al éste "abandonar la sala". Segundo —aparte de esa evidencia— se desfiló abundante prueba de conducta y expresiones suyas anteriores, demostrativas del elemento de deliberación. Y tercero, la expresión del licenciado Rivalta López —y su probable impacto en el ánimo del Jurado— es de carácter especulativo.

Los elementos esenciales del delito de asesinato son dar muerte a un ser humano con malicia premeditada. Como elemento mental, conlleva "atender a los hechos, actos y circunstancias que rodean a la muerte, la capacidad mental, motivación, manifestaciones y conducta de la persona, y luego de evaluar todo lo anterior inferir racionalmente si hubo malicia premeditada o no". D. Nevares-Muñiz, *Código Penal de Puerto Rico*, San Juan, Ed. Rev. C. Abo. P.R., 1986, pág. 138. En la modalidad de primer grado, el asesinato presupone no tan sólo la malicia premeditada, sino el elemento de deliberación. A su vez, la deliberación no es otra cosa que "la resolución . . . de matar, después de darle alguna consideración. . . . Ese lapso, sostienen las autoridades, puede ser tan rápido como el pensamiento". *Pueblo v. Rosario*, 67 D.P.R. 371, 375 (1947). Ambos elementos "pueden concebirse en el momento mismo de la realización del ataque". *Pueblo v. Torres Montañez*, 106 D.P.R. 125, 129 (1977). En el caso de autos están presentes. Así, el patólogo testificó que el cadáver de la señora Reyes evidenciaba tres (3) heridas de bala: dos (2) compatibles con disparos hechos a una persona que está corriendo y a distancia —E.N.P., págs. 15–16— y el tercero, de contacto, el cual por su trayectoria era compatible como hecho en una persona tirada boca abajo. E.N.P., págs. 14–15. Este último por sí solo era mortal. E.N.P.,

págs. 15–17. En estos extremos la prueba demostró que al coger el acusado Cepeda Rivera su revólver, ella salió corriendo de la casa y éste corrió detrás y la ultimó a balazos. E.N.P., pág. 12. El propio testimonio del acusado es revelador sobre lo que ocurrió.

Concluimos que el elemento de deliberación del asesinato quedó probado más allá de duda razonable, independientemente de las expresiones del licenciado Rivalta López.

## III

B. Incidió en error de derecho el Honorable Tribunal sentenciador al impartir instrucciones al Jurado en las cuales utilizó unas expresiones sobre la calidad de prueba; lo cual tuvo el efecto de privar al apelante de su derecho a ser juzgado por Jurado, ya que los comentarios vertidos por el magistrado provocaron que al deliberar el jurado hiciera suya las expresiones del magistrado sobre la calidad de prueba.

C. Erró el Honorable Tribunal de Instancia al instruir al Jurado de manera tal que, al leer el comentario al dorso de la instrucción sobre homicidio del *Libro de Instrucciones al Jurado*, desmereció la prueba de defensa sobre homicidio y predispuso al Jurado hacia un veredicto de asesinato en primer grado.

D. Cometió error el Honorable Tribunal sentenciador al instruir al Jurado sobre el delito de homicidio; fraseando dichas instrucciones en términos desfavorables para el acusado lo que movió al Jurado, dadas las expresiones del Tribunal, a actuar con prejuicio y parcialidad privando al apelante de su derecho a un juicio justo e imparcial. Alegato del apelante, pág. 16.

Por estar relacionados, examinemos estos errores conjuntamente. Se queja primero de que "antes de instruir al jurado sobre el delito de homicidio, formuló las expresiones siguientes: "'[e]n este caso se ha ofrecido prueba que *si es creída por el jurado puede "inducir"* al jurado a un veredicto de *homicidio y por eso* [*voy*] *a explicar qué constituye homicidio*'". (Énfasis suplido.) Alegato del apelante, pág. 29.

Nos argumenta que "[e]l utilizar la palabra 'inducir' tuvo el efecto [de] indicarle al juzgador de hechos, que si creían la prueba de homicidio ellos podrían rendir un veredicto por homicidio pero no estaban obligados a hacerlo. Respetuosamente consideramos que el Tribunal debió expresarse en términos mandatorios, e instruir al jurado que de ser creída la prueba de homicidio estaban obligados a rendir un veredicto por homicidio y que tenían que considerar dicha prueba en unión a toda la prueba presentada durante el proceso. *Pueblo v. Negrón Vélez*, 96 D.P.R. 419 (1968)". Alegato del apelante, pág. 30.

Por último, sostiene que en "adición a las expresiones del Magistrado antes citadas el Honorable Tribunal Sentenciador al instruir al jurado leyó un comentario al dorso de las instrucciones sobre Homicidio del *Libro de Instrucciones al Jurado*, que lee como sigue: 'Indudablemente en *un caso de asesinato* el Tribunal Sentenciador debe darle al jurado instrucciones de homicidio *si de la prueba surge alguna evidencia* que justifique el veredicto de homicidio. *A[u]n cuando esa evidencia sea "escasa" o "débil"*, la misma debe apreciarse por el jurado y no por el Tribunal. Por otro lado . . .' . (Énfasis nuestro)." Alegato del apelante, pág. 30. Continúa expresando que el "comentario del *Libro de Instrucciones al Jurado*, por la fraseología empleada, se presta para que el jurado interprete que el sentir del Magistrado era que se trataba de 'un caso de asesinato' y que la prueba presentada para lograr un veredicto por homicidio era 'escasa o débil', por lo que dicho testimonio debía ser descartado. El efecto perjudicial se magnificó por el hecho que la única prueba de homicidio la produjo el acusado mediante su testimonio, quien se encontraba en desventaja por el mero hecho de ser el imputado. El testimonio del apelante se contrapuso al de un abogado y varios testigos de cargo. Respetuosamente consideramos, que de los comentarios leídos por el magistrado, el jurado razonablemente podía inferir que la prueba

de homicidio debía ser descartada por 'escasa y débil'". Alegato del apelante, pág. 30.

*Tampoco tiene razón.* El apelante Cepeda Rivera incurre en el error de inyectarle un alcance que no tiene las instrucciones, citando fraccionada y únicamente dos (2) extractos de las mismas. El enfoque es *equivocado*; el análisis y enjuiciamiento tiene que ser *integral.* Si examinamos la totalidad de las instrucciones correspondientes a asesinato y homicidio y sus elementos, conjuntamente con las generales del Manual de Instrucciones al Jurado, nos percatamos que el error no fue cometido y que las mismas son correctas.

*Inducir* significa "[i]nstigar, *persuadir,* mover a uno". *Diccionario de la Lengua Española,* 20ma ed., Madrid, Ed. Espasa-Calpe, 1984, T. II, pág. 768. Esta aclaración despeja cualesquiera dudas en cuanto a la primera instrucción. Respecto a la segunda —necesidad de instrucción aun cuando la evidencia sea "escasa o débil"— no vemos cómo pueda comunicarse adecuadamente la instrucción, y ser seguida por el jurado, sin así expresarse. Después de todo, la norma doctrinaria reiterada en *Pueblo v. Bonilla Ortiz,* 123 D.P.R. 434 (1989), es a los efectos de que es menester cubrir y dar instrucciones sobre los elementos de los delitos inferiores o comprendidos en éste, si de la prueba surge alguna evidencia que así lo justifique, "'aunque la prueba de defensa sea *débil, inconsistente o de dudosa credibilidad'". Pueblo v. Bonilla Ortiz,* supra, pág. 439.

Consistentemente hemos resuelto que las instrucciones contenidas en el Manual de Instrucciones al Jurado, gozan de una presunción de corrección. *Pueblo v. Mangual Hernández,* 111 D.P.R. 136, 146 (1981); *Pueblo v. Ortiz González,* 111 D.P.R. 408, 410 (1981); *Pueblo v. Mattei Torres,* 121 D.P.R. 600 (1988).

En resumen, los señalamientos y argumentos del apelante Cepeda Rivera son altamente especulativos. La prueba

reseñada es más que suficiente para sostener la convicción de asesinato en primer grado.

Por los fundamentos expuestos, *se confirma la sentencia.*

Lo pronunció y manda el Tribunal, y certifica el señor Secretario General. El Juez Asociado Señor Hernández Denton concurre con el resultado sin opinión escrita. El Juez Presidente Señor Pons Núñez disiente sin opinión escrita. El Juez Asociado Señor Rebollo López emitió opinión disidente.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

*Disentimos.* Nuestro disenso, sin embargo, no se debe a que tengamos duda alguna sobre el hecho de que el apelante Ernesto Cepeda Rivera, de una manera criminal y viciosa, cegó la vida de su esposa Ada Carenia Reyes Sánchez. De hecho, somos del criterio personal que la prueba que presentara el Estado ante el Tribunal Superior, Sala de Caguas —la cual, obviamente, fue la que creyó el Jurado— demuestra más allá de duda razonable la comisión por parte del apelante de un delito de asesinato en primer grado.

¿*Por qué entonces el disenso*? Disentimos por razón de que, a diferencia de otros, al ejercer nuestra función de revisión desde este Foro apelativo mantenemos siempre presente el ideal de que bajo nuestro sistema de justicia todo acusado, no importa quién éste sea ni el delito por el cual se le acuse, *tiene derecho a un juicio justo e imparcial.*

I

La Constitución del Estado Libre Asociado de Puerto Rico garantiza el derecho a juicio por jurado a toda persona

que, como el aquí apelante, sea acusada de la comisión de un delito grave.[1] Dentro de este esquema, el Jurado actúa como el "juzgador de los hechos". Ello significa que es el Jurado el que determina no sólo si el imputado es culpable o inocente, sino que también el delito, o grado del mismo, por el cual éste debe responder. *Pueblo v. Cruz Correa*, 121 D.P.R. 270 (1988).

Para que el Jurado pueda desempeñar y llevar a cabo tan delicada e importante función, los miembros del mismo deben ser instruidos sobre el derecho aplicable —*en forma adecuada, objetiva e imparcial*— por el magistrado que preside el proceso. A esos efectos, reiteradamente hemos resuelto que nuestro "ordenamiento tiene como *principio rector* que las instrucciones al jurado deben cubrir, *si la prueba lo justifica*, no sólo los elementos de delitos inferiores al delito imputado o comprendido dentro de éste, sino también los elementos esenciales de las defensas levantadas por el acusado, así como los puntos de derecho que *bajo cualquier teoría razonable* pueden estar presentes en las deliberaciones, *aunque la prueba de defensa sea débil, inconsistente o de dudosa credibilidad. Pueblo v. Prados García*, 99 D.P.R. 384 (1970); *Pueblo v. Tufiño Cruz*, 96 D.P.R. 225 (1968); *Pueblo v. Burgos*, 76 D.P.R. 199 (1954); *Pueblo v. Serbiá*, 75 D.P.R. 394 (1953); *Pueblo v. Méndez*, 74 D.P.R. 913 (1953); *Pueblo v. Galarza*, 71 D.P.R. 557 (1950). Ello es así *porque corresponde al jurado y no al tribunal* rendir un veredicto conforme a la ley y los hechos del caso *según aquél aquilate la prueba y determine los hechos*". (Énfasis suplido.) *Pueblo v. González Colón*, 110 D.P.R. 812, 815 (1981).[2]

Ello *no* significa, sin embargo —como erróneamente sostiene la mayoría del Tribunal en la sentencia que en el día de

---

[1] Véase .Art. II, Sec. 11, Const. E.L.A., L.P.R.A., Tomo 1.

[2] *Pueblo v. Bonilla Ortiz*, 123 D.P.R. 434 (1989).

hoy emite— que el juez que preside el proceso pueda *comentar o calificar* la prueba que desfile en el proceso. Eso fue precisamente lo que sucedió en el presente caso. He ahí la *razón específica* de nuestro disenso.

## II

Como surge de la propia sentencia mayoritaria emitida, el tribunal de instancia —*apartándose de las instrucciones contenidas en el Manual de Instrucciones al Jurado y haciendo uso de un comentario editorial que aparece en el mismo, el cual si bien es para su orientación, no forma parte de las instrucciones propiamente*— le transmitió a los señores del Jurado la siguiente "instrucción":

> Indudablemente en *un caso de asesinato* el Tribunal Sentenciador debe darle al jurado instrucciones de homicidio *si de la prueba surge alguna evidencia* que justifique el veredicto de homicidio. *A[u]n cuando esa evidencia sea "escasa" o "débil"*, la misma debe apreciarse por el jurado y no por el Tribunal. (Énfasis suplido.) Alegato del apelante, pág. 30.

Como correctamente señala la representación legal del apelante Cepeda Rivera, la fraseología utilizada "se presta para que el jurado interpret[ara] que el sentir del magistrado era que se trataba de 'un caso de asesinato' y que la prueba presentada [por la defensa] para lograr un veredicto por homicidio era *'escasa o débil'*, por lo que dicho testimonio debía ser descartado". (Énfasis en el original.) Alegato del apelante, pág. 30.

*La calificación de la prueba por parte del juez que preside un juicio por jurado es una práctica sumamente peligrosa, extraña a nuestro ordenamiento jurídico, la cual no debe tener cabida en nuestro sistema de justicia criminal.* Si ello se permite, a todos los efectos prácticos, el juez se convierte en el juzgador de los hechos. Ello así por cuanto, como es del conocimiento de todo aquel que haya practicado la profesión en el campo criminal, el Jurado de ordinario está

siempre sumamente atento y pendiente del magistrado y cualquier comentario o gesto de éste tiene efectos inmediatos y profundos en el Jurado. En palabras del Honorable Carlos Irizarry Yunqué, ex Juez Asociado de este Tribunal:

> La condición humana es frágil, sobre todo la de las personas sencillas y humildes, como son la mayoría de las que actúan como jurados. *La inclinación que el juez pueda tener con respecto a la adjudicación de los hechos, si conocida del jurado, tiene un enorme peso en su decisión.* Ellos desconocen los intrincados problemas sobre la aplicación del Derecho penal y su desenvolvimiento en función de los ordenamientos procesales. Miran al juez como orientador. *Cualquier expresión o gesto suyo que pueda considerarse como indicio de su pensamiento ha de tener necesariamente un gran impacto en la mente de cada jurado y en su proceso decisional.* Se ha reconocido como un axioma el hecho de que el *jurado es altamente sensible a toda manifestación judicial, debido a la autoridad que para el jurado conllevan las palabras del juez.* (Énfasis suplido.) *Pueblo v. Rivera Carmona,* 108 D.P.R. 866, 879–880 (1979).

### III

La prueba que presentara la defensa en el presente caso tenía el obvio propósito de lograr que los señores del Jurado rebajaran la calificación del delito imputado y rindieran un veredicto condenatorio por el delito de homicidio voluntario. No tenemos duda alguna en nuestra mente que el comentario o calificación, por el magistrado, de dicha prueba como una "escasa o débil" tuvo el efecto de anular cualquier oportunidad de que el Jurado, como juzgador de los hechos, aquilatara la misma en forma objetiva y favorable al apelante. *Ello, en nuestra opinión, impidió que éste tuviera un juicio justo e imparcial.* Revocaríamos, en consecuencia, la convicción y sentencia apelada y devolveríamos el caso al foro de instancia para la celebración de un nuevo juicio.